Peter Negley, and Charles Negley, trading as Negley & Co. vs. Joseph H. Farrow.

*Libellous publication—Liberty of the Press—Right to discuss the Official conduct of a public man—Newspaper publications—Malice as an element in an action for Libel—Publications libellous per se—Question before the Jury on the plea of Not guilty—Estimating damages—Statute of 32 Geo. III, chap. 60—Admissibility of Evidence.*

Any publication which tends to injure one's reputation, and expose him to hatred or contempt, if made without lawful excuse, is libellous.

The liberty of the press guaranteed by the Constitution, is a right belonging to every one, whether proprietor of a newspaper or not, to publish whatever he pleases without the license, interference or control of the government, being responsible alone for the abuse of the privilege.

In every free country, a citizen has the right, within lawful and proper limits, to discuss, and censure boldly, and fearlessly the official conduct of a public man ; but there is a broad distinction between fair and legitimate discussion of the conduct of a public man, and the imputation of corrupt motives by which that conduct may be supposed to be governed. And if one goes out of his way to asperse the personal character of a public man, and to ascribe to him base and corrupt motives, he must do so at his peril, and must either prove the truth of what he says, or answer in damages to the party injured.

The fact that one is the proprietor of a newspaper, entitles him to no privilege in this respect not possessed by the community in general. The law recognizes no duty imposed on him, arising from his relations to the public, to defame and libel the character of any one; and if he does, it is no answer to say he did it in good faith and without malice, honestly believing it to be true.

Malice, but not malice in the ordinary sense of hatred, or ill will against the person of whom the defamatory words are spoken, is

Negley *vs.* Farrow.

· an essential element in an action for libel; but if the publication be in itself libellous, the law in such cases implies malice.

In an action of libel against the editors of a newspaper, based on the publication by them of an article criticising the conduct of the plaintiff as a public officer, it was HELD:

1st. That if the article were *per se libellous*, and its publication established, the only question before the jury on the general issue plea of not guilty, was the amount of damages which under all the circumstances the plaintiff was entitled to recover.

2nd. That in estimating the damages the jury were to consider whether the article was published maliciously and wantonly, for the purpose of injuring the character and reputation of the plaintiff; or as editors of a newspaper honestly commenting upon the official acts and conduct of the plaintiff, and in the belief of its truth.

3rd. That the Statute of 32 Geo. III, ch. 60, " Fox's Libel Act," was not in force in this State, and here the Court had always decided whether the publication was in law a libel, leaving the jury to find the fact of publication, and such other facts as might be pertinent to the issue.

The plaintiff, for the purpose of proving malice in fact, having offered in evidence other libellous articles of similar import, published by the defendants subsequent to the one set out in the declaration, it was HELD:

1st. That the defendants had the right to prove the truth of these subsequent libels, and to prove all the facts and circumstances surrounding their publication.

2nd. That on the other hand it was competent for the plaintiff to prove that they were not published in good faith, but were published maliciously and wantonly, for the purpose of defaming and injuring his character.

3rd. That the defendants, in mitigation of damages, had a right to prove that the libel complained of was published by them under an honest conviction of its truth, arising from probable grounds of suspicion *known to them at the time of using the defamatory language;* but that evidence of such probable grounds was inadmissible unless accompanied by an offer to prove that they were known to the defendants at the time of the publication of the libel.

APPEAL from the Circuit Court for Washington County.

The appellee sued the appellants as editors, proprietors and publishers of a newspaper called *"The Herald and Torchlight,"* published in Hagerstown, in an action of libel. The declaration is substantially set forth in the opinion of the Court. The defendants filed a general demurrer to the declaration which was overruled. They then filed the plea of "did not commit the wrong alleged," and the two following special pleas:

2nd. That the defendants at the time of the publication of said alleged libellous articles in the several counts of the plaintiff's declaration, were the publishers, in Washington County, of a certain public newspaper called *"The Herald and Torchlight,"* and at said time the plaintiff was the State Senator of Washington County, in the Legislature of Maryland, and acting as such, and in such public capacity his votes and actions were proper subjects for investigation and information, and that said alleged libellous articles related to the official conduct of the plaintiff acting in such public capacity, and was proper for public information, and that said publications were made in good faith, and in the belief in their truth, and not made maliciously nor negligently.

3rd. That the subject concerning which the article complained of was written, was a matter of great interest and importance to the people of Washington County and the State of Maryland, who, being numerous, could only be reached through the press; that the votes and acts of the plaintiff, as representing the people of Washington County, were a matter in which the said people were interested, and a proper subject of discussion in the newspapers; and that the defendants believing that such votes and acts did not correctly represent the people of Washington by whom the plaintiff was elected to the Senate of Maryland, and were an injury to them, discussed the same in good faith and without malice, and made only such

statements and comments as they believed, on due inquiry and reasonable grounds, to be true and just and warranted by the plaintiff's acts.

The plaintiff joined issue on the first plea, and demurred to the second and third pleas, which demurrer was sustained.

*First Exception.*—The defendants, after offering evidence tending to prove that the plaintiff and Jas. Hawkins had a contract to furnish stone to lengthen a lock on the canal, offered to prove the following facts, to wit: That the stone furnished by plaintiff and Hawkins, cost them from twelve to seventeen cents per perch, and that it cost them fifteen cents to deliver them, and that this was all the cost and expense they were put to; and that they received from the Canal Company eighty cents per perch; and further that they received said contract without any competition or public notice, to which evidence the plaintiff objected, and the Court (ALVEY, C. J., MOTTER, and PEARRE, J.) sustained the said objection, and ruled the evidence to be inadmissible. The defendants excepted.

*Second Exception.*—The defendants then offered to prove that it was known at the time of the election of Treasurer, in January, 1882, to the public, and to the plaintiff, that the Governor and Comptroller, two members of the Board of Public Works, differed in reference to the management of the canal; that the Governor was opposed to the then management and that the Comptroller was in favor of it; and, further, that Mr. Compton was known to agree with Mr. Keating, and both in favor of the retention of the officers of the canal, who had given the alleged contract to the plaintiff, to which evidence the plaintiff objected, and the Court sustained the objection and ruled the evidence to be inadmissible. The defendants excepted.

*Third Exception.*—The plaintiff, in rebuttal, gave evidence tending to show that the plaintiff had no contract to furnish stone on the canal, and explained the circumstances of his votes on Feb. 1st, being the votes referred to in the alleged libellous article on the printing question and then offered in evidence the Journal and Proceedings of the Senate of Maryland, which took place on the tenth day of February, 1882, said Journal and Proceedings having been previously proved by the Secretary of the Senate to be correct, in reference to the publication of the laws, and offered to read to the jury the action and votes of the plaintiff in reference to the publication of the laws, which took place Feb. 10th, 1882, tending to show that the plaintiff was in favor of the repeal of the subsidy law; to all of which evidence the defendants objected as inadmissible, but the Court overruled the objection and allowed the evidence to be read to the jury. The defendants excepted.

*Fourth Exception.*—The counsel for the plaintiff further in rebuttal, asked of the plaintiff the following question: State to the jury your action and vote in reference to the election of Treasurer of Maryland last winter, and whether you voted for Mr. Pratt or Mr. Compton? To which the plaintiff answered, I voted for Mr. Pratt; I got my ballot out of the waste paper basket, and gave the circumstances of his vote and the finding of the ballot. To the asking of said question, and to the answer to the same, the defendants objected, but the Court overruled the objection, and allowed the question to be asked and the answer to be given, and admitted the same as testimony in the cause. The defendants excepted.

*Fifth Exception.*—The counsel for the plaintiff further in rebuttal, asked the plaintiff the following question: State whether you had any contract or understanding with Mr. Gorman, directly or indirectly, in reference to your votes at Annapolis on the election of Treasurer, and

on the publication of the laws? To which the plaintiff answered, I had not. To the asking of said question, and to the answer to the same, the defendants objected, but the Court overruled the objection, and allowed the question to be asked, and the answer to be given and admitted the same as testimony in the cause. The defendants excepted.

*Sixth Exception.*—The plaintiff also gave in evidence the testimony of Senator Moore, tending to sustain the testimony of the plaintiff, Farrow. And further, in rebuttal, called A. P. Gorman as a witness, who testified he knew plaintiff since 1872; never had any business transaction with him, and never knew him to vote against his party in political questions, and then asked him the following questions, to wit: Did you, or not, have any arrangement with Mr. Farrow, as to how he should vote for Treasurer of the State of Maryland, or upon the publication of the laws? To which the witness answered, I had not. To the asking of said question, and to the answer to the same, the defendants objected, but the Court overruled the objection, and allowed the question to be asked, and the answer to be given, and admitted the same as testimony in the cause. The defendants excepted.

*Seventh Exception.*—The plaintiff, further, in rebuttal, called L. G. Stanhope, Superintendent of the Chesapeake and Ohio Canal, and asked him the following question: State whether the rates given for this contract were higher than the rates given for other contracts, to furnish stone for lengthening locks on the canal, and whether they were higher than you were instructed to give by the Canal Board? To which witness answered, the rates were not higher than given to other persons, who had contracts to furnish stone; all received eighty cents per perch, and which was not higher than the price fixed by the Canal Board, but was given to Hawkins, as to others, at the price fixed by the board. To the asking of said

question and to the answer to the same, the defendants objected, but the Court overruled the objection and allowed the question to be asked, and the answer to be given, and admitted the same as testimony in the cause. The defendants excepted.

*Eighth Exception.*—The plaintiff then offered the three prayers as follows, to wit:

1. If the jury believe from the evidence that the defendants, as partners, as charged in the declaration of the plaintiff, were the editors, proprietors and publishers of the newspaper published in Hagerstown, Washington County, and State of Maryland, called "*The Herald and Torchlight*," that the plaintiff was, on the 8th day of February, 1882, the member from said county of the Senate in the General Assembly of said State and was then attending the session of the said General Assembly; and that the said defendants published in the said issue of the said paper of, and concerning, the plaintiff the words set forth in said declaration, then the plaintiff, under the law, is entitled to recover.

2. If the jury believe the facts as set forth in the plaintiff's first prayer, the law imputes malice to the defendants, by the publication of the words, and the jury in awarding damages may take into consideration the publicity of the libel and the injury to the feelings and reputation of the plaintiff, and the mortification such a publication and such charges would be likely to produce; and if the jury further find that the said publication proceeded from express malice, or ill will to the plaintiff, then they may award punitive or exemplary damages.

3. The jury are instructed that the article published in the defendant's paper of 8 Feb'y, 1882, (if they find such publication to have been made,) and read in evidence to the jury, is libellous and actionable in itself, and even if the jury believe that the defendants, or either of them, before writing said article, had received information from

Mr. Briscoe or Mr. King, or any other person, that it was believed in Annapolis that the plaintiff had voted for Compton for Treasurer, and that he or they relied upon said information in writing said article, this evidence was snly admitted to go to the jury in mitigation of damages, and cannot defeat the plaintiff's recovery in this action; and the jury are further instructed that the fact that said article was published in a newspaper, confers no privilege upon it which will relieve it from the malice the law imputes to it.

And the defendants offered the seven following prayers:

1. If the jury are satisfied from the evidence that at the time of the publication of the article complained of, the plaintiff was a member of the Senate of Maryland, and had been elected thereto as a republican in politics to represent Washington County therein, and are further satisfied that the defendants were, at that time, the proprietors and publishers of the "*Herald and Torchlight*," a newspaper having a considerable circulation in said Washington County, and among the constituents of said plaintiff, then the defendants had a right to publish, and fairly and without malice to criticise, discuss and comment on the votes and acts of said plaintiff as such senator; and if the jury are satisfied from the evidence that said publication was a fair and honest discussion of, or comments upon, a matter of public interest in connection with the votes and acts of the plaintiff as senator as aforesaid, it is in point of law privileged and is not the subject of an action, and their verdict will be for the defendants, unless the jury should further believe from the evidence that said publication was induced by malice on the part of the defendants toward the plaintiff.

2. If the jury shall believe from the evidence that the plaintiff said to the defendants, or either of them, or to any other person or persons, who communicated it to the defendants, or either of them, that he had, or had had a

contract, or part of a contract, to furnish stone to lengthen a lock or locks on the Chesapeake and Ohio Canal, or shall believe from the evidence that James E. Hawkins made or had an oral agreement or bargain with the Chesapeake and Ohio Canal Co., to furnish stone for lengthening a lock or locks on said canal, and having such contract, bargain or agreement, by a like oral bargain or agreement associated the plaintiff as partner with him in such contract, and they, as partners, performed the said contract, the plaintiff attending to a certain portion of the business, furnishing or agreeing to furnish the capital required therefor, and sharing the profits of the transaction with said Hawkins, then the defendants were entitled to state fairly the fact, that plaintiff "was given in part, a contract by the Canal Board to furnish stone to lengthen a lock or locks on the canal," and fairly and without malice, to comment on such facts, and to draw in good faith, any proper inference therefrom, as to the influence which the same had, or might have upon the plaintiff's votes or acts as a public man and a senator, and no action will lie against them therefor, and the jury will not find a verdict against them on account thereof.

3. If the jury are satisfied from the evidence, that at the time of the publication of the article complained of, the plaintiff was a member of the Senate of Maryland, and had been elected thereto as a republican in politics, to represent Washington County therein, and are further satisfied that, prior to the publication complained of, and in anticipation of an election of Treasurer of the State of Maryland, to be made by the General Assembly, a caucus was held, which was attended by all the republican members of said Senate, including the plaintiff, and that at such caucus Enoch Pratt was nominated as the republican candidate for State Treasurer, at the election so to be held, and are further satisfied that at the election of Treasurer thereafter held, the ballots were cast and counted, and it then appeared therefrom, that said Enoch Pratt had re-

ceived in said senate, one vote less than the number of republican senators who were present and took part in said caucus, and who were present and voted at said election, and that Barnes Compton, the democratic candidate for Treasurer at said election, (if they believe that Barnes Compton was the democratic candidate at said election,) received one vote more than the number of democratic senators present and voting at said election, and further believe that the defendants at the time of the publication complained of, were the proprietors and publishers of the "*Herald and Torchlight*," the same being a republican newspaper, then the said defendants were entitled to publish all facts coming to their knowledge respecting said election of Treasurer, and to make fair and *bona fide* comments thereon, and to state any and all facts coming to their knowledge, tending to indicate which of the republican senators did not vote for Enoch Pratt, and did vote for Barnes Compton, and to draw fairly and *bona fide*, and without malice, all inference fairly deducible therefrom. And if the jury are satisfied that the publication complained of, so far as it relates to said election of Treasurer was made "under a belief of its truth, and without malice, honestly and *bona fide*," then the same was not actionable, and their verdict will be for the defendants, unless they shall further find under the other instructions of the Court, a verdict for the plaintiff on the ground of some other part or parts of said publication.

4. The jury in considering of their verdict, should regard only the publication complained of, as the same was made by the defendants, and not the construction placed thereon in the plaintiff's declaration, and should not regard said publication as charging the plaintiff with bribery, unless they find that that is a necessary or fair construction of the language used; and if they find that the language of the publication, with reference to a contract spoken therein, is fairly susceptible of an innocent mean-

ing, the defendants are entitled to have that construction placed upon it, the plaintiff having offered no evidence tending to show that the defendants intended to convey, or that any one understood it to convey a different meaning.

5. That if the jury find from the evidence that there was a law under which $1,200 was paid to certain newspapers in each county in the State, for printing certain laws passed by the Legislature, and further find that a bill was before the Senate of Maryland, to repeal said law, and that said bill had passed a first and second reading and was before the said Senate for its third reading and final passage on the 1st day of Feb. last, and that a motion was made to refer said bill to the finance committee of the said Senate, and further find that the plaintiff, as a member of said Senate, voted to refer said bill to said committee, and further find from the evidence that it was usual in order to defeat bills to refer them to a committee instead of voting against them upon their third reading, and further find that the report of said proceedings in the said Senate, as given in the alleged libellous article read in evidence, was substantially correct and not garbled or partial, and made *bona fide* and without malice, then the publishing of the said report is not libellous, and the plaintiff is not entitled to recover for the publication of the same by the defendants. And the jury is further instructed, that if they find the facts as above set forth, and also find that the defendants are the publishers of a public newspaper, and commented upon and criticised the said conduct and said official act of the plaintiff in the said alleged libellous article, and that the said comments and criticism did not exceed the limits of a fair and *bona fide* discussion by a writer of a public newspaper of a matter of public interest, (if the jury find that said proceedings, and the plaintiff's action in reference to the same, were matters of public interest,) and further find that said comments and criticism were made *bona fide* and

without malice, and in the belief of the truth of the same, and upon probable cause, then the plaintiff is not entitled to recover on account of said comments and criticism.

6. If the jury shall believe from the evidence, that so much of the publication complained of as purported to be copied from the "*Baltimore Sun*," is a fair report of the proceedings of the Senate of Maryland, with respect to the recommitment of the bills for the amendment and repeal of the laws relating to the publication of the laws, and to which it related; and shall further believe, that the comments upon said action in the publication complained of, were fair and *bona fide*, and made without malice on the part of the defendants, then that portion of the publication complained of, including said extract from the "*Baltimore Sun*," and the defendants' comments thereon, was not actionable and the plaintiff is not entitled to a verdict for damages on account thereof.

7. That if under the pleadings and evidence in the cause, the jury find for the plaintiff, in estimating the amount of damages and in mitigation of the same, they shall take into consideration all the attending and mitigating circumstances, and if they find that the plaintiff was a public man, attending the session of the Legislature, and that the defendants were public journalists, and thought that as such they had a right to comment upon the official acts and conduct, and even the motives in reference thereto of the plaintiff, and that they did so comment without malice in fact, in the belief of the truth of said comments, and with a view solely of informing their readers of the official acts, conduct and motives of their public servant, these are proper matters and things to be taken into consideration in mitigation of damages.

The Court granted the prayers of the plaintiff, and the seventh prayer of the defendants, and rejected the defendants' other prayers. The defendants excepted. The jury rendered a verdict for the plaintiff for $3,000, and judg-

ment was entered for the same, and costs. The defendants. appealed.

The cause was argued before MILLER, YELLOTT, STONE, ROBINSON, IRVING, and RITCHIE, J.

*H. H. Ke dy,* and *Henry Stockbridge,* for the appellants..

Words must not be construed to impute a crime if they have a milder sense, and may reasonably be construed to have another and harmless meaning. *Newbold vs. Bradstreet,* 57 *Md.,* 38; *Peterson vs. Sentman,* 37 *Md.,* 140; *Stitzell vs. Reynolds,* 59 *Pa.,* 488.

Freedom of discussion is allowed when the official acts of a public officer are in question, and when matters of public interest are discussed. On such occasions there is a qualified privilege. *Cooley on Torts,* 217 *and* 218; *Crane vs. Waters,* 10 *Fed. Reports,* 619; *Snyder vs. Fulton,* 34 *Md.,* 137; *Henwood vs. Harrison, Law Reports,* 7 *C. P.,* 606; *Davis vs. Duncan, Law Reports,* 9 *C. P.,* 396.

Where the occasion is privileged, it is for the plaintiff to prove malice. The words will not imply malice.

The rule laid down in the case of *Clark vs. Molyneaux,* (3 *Queen's Bench Division,* 237—28 *Eng. Reports, Moak's Ed.,* 217,) is that the plaintiff must establish "that the statements complained of were made from an indirect motive, such as anger, or with a knowledge that they were untrue." "If the defendant believed what he said was true, that he acted *bona fide* and honestly, that is sufficient to protect him." And so are all the authorities. *McBee vs. Fulton,* 47 *Md.,* 403; *Usill vs. Hales,* 3 *Com. Pleas Div.,* 319 (30 *Eng. Reports, Moak's Ed.,* 188;) *Chapman vs. Calder,* 14 *Pa.,* 365; *Odger vs. Mortimer,* 28 *L. T.,* 472; *Odgers on Libel and Slander,* 50; *Folkard's Starkie on Slander and Libel,* 334.

That part of the alleged libellous article giving the proceedings of the Senate and the comments thereon, was.

clearly privileged, and whether the report of the proceedings was substantially correct and not partial, and the comments thereon fair and *bona fide,* were matters which should have been left to the jury. *Wason vs. Walter, Law Rep.,* 4 *Q. B.,* 73; *Snyder vs. Fulton,* 34 *Md.,* 128; *McBee vs. Fulton,* 47 *Md.,* 424; *Odgers on Libel and Slander,* 34; *Folkard's Starkie on Slander and Libel, side p.* 242; *Sweeney vs. Baker,* 13 *W. Va. Rep.,* 158. (31 *Amer. R.,* 757.)

*John F. A. Remly,* and *H. Kyd Douglas,* for the appellee.

It is objected to the declaration that the innuendoes enlarge the colloquium to the libellous article, and that in this regard the declaration is faulty. But the objection is not well grounded; and even if it were, it is a principle in pleading so well established as to need little citation of authorities, that if the article complained of, be libellous in itself, and set out in the declaration as in this case, the innuendoes are not necessary; and even if they attempt to enlarge the meaning of the article, they may be rejected as surplusage. *Townshend on Slander and Libel, sec.* 344; *Comm'rs vs. Snelling,* 15 *Pickering,* 346; *Roberts vs. Camden,* 9 *East,* 93; *Crosswell vs. Weed,* 25 *Wendell,* 621; *Peterson vs. Sentman,* 37 *Md.,* 155; 1 *Am. Leading Cases,* (5th *Ed.,*) 161.

So also with the inducement. *Townshend on Slander and Libel,* 3rd *Ed., secs.* 308, 311 *and* 313.

Any person, whether in his private capacity, or as the editor of a public newspaper, has a right honestly to discuss all matters of public interest, and fairly to comment on and criticise the public acts of official persons. Such a proposition we do not for a moment question. But such privilege does not extend to the right of falsely charging the plaintiff, as a senator, with acts of gross moral turpitude, with having corruptly voted for a candi-

date for State Treasurer of opposite political opinions, and to award a valuable contract to print the public laws, and with having received a bribe therefor, in the shape of a valuable contract to lengthen locks on the canal.   "Such a charge is not within the editor's privilege ; he makes it upon his own responsibility as any other citizen, and is bound to establish its truth, by his pleading and proof, or to answer to the party for the damage and injury he may suffer in consequence of the charge."

The rule of damage in such action is, that the plaintiff, if the verdict is found in his favor, is entitled to recover compensation for such damage as the jury may find he sustained as the direct consequence of the publication; and if the jury should find from the evidence that the publication proceeded from express malice or ill-will to the plaintiff, then the jury may award to him such exemplary or punitive damages as they may think the facts of the case justify.   *Snyder vs. Fulton*, 34 *Md.*, 137 and 138.

In *Seymour vs. Butterworth*, 3 *Foster & Fin.*, 377, the plaintiff, a barrister, Recorder of Newcastle-on-Tyne, and member of Parliament, sued for an alleged libel upon him, published in the *Law Magazine*.   In the charge made by Lord Chief Justice COCKBURN, we find :

A man's public political conduct is matter for the freest and fullest discussion on the part of a writer in a public journal.   And to animadvert on those who lend themselves to a system of buying and selling votes in Parliament, "is within the legitimate province of a public writer," but if he goes beyond that, and asserts that one "has bargained to sell his vote," it is "a charge which no man writing, whether in public or in private, should venture to make against another."   In another case, *Campbell vs. Spottis-woode*, (3 *Fost. & Fin.*, 432,) Lord Chief Justice COCK-BURN said, "It cannot be said, that because a man is a public man, a writer is entitled, not only to pass judgment upon his conduct, but to ascribe to him corrupt and dis-

honest motives." *Townshend on Slander and Libel,* (3rd *Ed.,*) *note* 1, *pages* 491, 2 *and* 3.

The article complained of, is a libel *per se.* *Colby vs. Reynolds,* 6 *Verm't,* 489 ; *King vs. Root,* 4 *Wend.,* 113 ; *Thomas vs. Croswell,* 7 *Johns.,* 264 ; *Com'w vs. Blanding,* 3 *Pick.,* 304 ; *Kinney vs. Nash,* 3 *N. Y.,* 177 ; *Cramer vs. Riggs,* 17 *Wend.,* 209 ; *Townshend on Slander and Libel,* (3rd *Ed.,*) *sec.,* 196, *etc. ; Hagan vs. Hendry,* 18 *Md.,* 191 ; *Folkard's Starkie on Slander and Libel, pages* 179, 331, *secs.* 269 *and* 270 ; 1 *Am. Leading Cases,* (5th *Ed.,*) 128, 135 ; *Barr vs. Moore,* 87 *Penn.,* 390.

The distinction between libel and slander, as to the grade of the offence, is well known. 1 *Am. Leading Cases,* (5th *Ed.,*) *notes,* 125.

The article in question is not privileged. *Sweeny vs. Baker,* 13 *W. Va.,* 158 ; *Stebbins vs. Merritt,* 10 *Cush.,* 25 ; *Curtis vs. Massey,* 6 *Gray,* 281 ; *Seeley vs. Blair, Wright,* 358 *and* 683 ; *Aldrich vs. Press Print Co.,* 9 *Minn.,* 133 ; *Hagan vs. Hendry,* 18 *Md.,* 191 ; *Garrett vs. Dickerson,* 19 *Md.,* 419 ; *Snyder vs. Fulton,* 34 *Md.,* 128 ; *Woodgate vs. Ridout,* 4 *Foster and Fin.,* 217 ; *Townshend on Slander and Libel,* 209 ; *Sunderlin, et al. vs. Bradstreet, et al.,* 46 *N. Y.,* 188.

In case of privileged communications, probable cause is a bar to the action, but not in a case where the communication is not privileged. There, justification must be pleaded and proved. *Chapman vs. Calder,* 14 *Pa.,* 368 ; *Gray vs. Pentland,* 2 *S. & R.,* 23.

Even then there must be probable cause, the belief of the writer is not enough. *Chapman vs. Calder,* 14 *Pa.,* 368.

And probable cause is a reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in believing that the accused was guilty. 1 *Am. Leading Cases,* 254 ; 3 *Wash. C. C. Rep.,* 31.

Malice, in an action of this kind, consists in intentionally doing, without justifiable cause, that which is injurious to another, and everything injurious to the character of another, is taken to be false, unless it is shown by plea to be true. Therefore, every publication injurious to character, is, in law, false and malicious, until the presumption of falsehood is met by plea of the truth, or the presumption of malice is removed by showing a justifiable occasion or motive. 1 *Am. Lead. Cases,* 135; *Townshend on S. & L.,* sec. 388; *Hagan vs. Hendry,* 18 *Md.,* 191.

There was no allegation of special damage in the declaration, because it was not necessary. Special damages are those damages which are not the necessary consequences of the language complained of. But when the language is actionable *per se,* special damage need not be alleged, and if alleged, need not be proved. Hence no proof of the kind was offered. *Townshend on Slander and Libel,* sec. 345; *Folkard's Starkie on Slander and Libel,* sec. 197, 450, *et seq.*

Libel *vel non* is for the Court. *Townshend on Slander and Libel,* sec. 286; *Pittock vs. Oneill,* 63 *Penn.,* 256; *Moore vs. Bennett,* 48 *N. Y.,* 472; *Gabe vs. McGinnis,* 68 *Ind.,* 538; *Snyder vs. Andrews,* 6 *Barb.,* 43; *Wagaman vs. Byers,* 17 *Md.,* 185. Privilege, also, has always been considered for the Court. *Townshend on Slander and Libel,* sec. 288; *Maurice vs. Worden,* 54 *Md,* 257. If an article be actionable without privilege, its falsity being conceded, the questions of fairness, probable cause, &c., are for the jury only in mitigation of damages, and not in bar. *Hagan vs. Hendry,* 18 *Md.,* 191; *Garrett vs. Dickerson,* 19 *Md.,* 419; *Barr vs. Moore,* 87 *Penn.;* 390.

ROBINSON, J., delivered the opinion of the Court.

This is an action of libel against the defendants, now appellants, editors and proprietors of a newspaper. Without setting out the alleged libel at length, it is sufficient

to say, it charges the plaintiff, elected as a republican senator from Washington County, with being under the influence and control of a corrupt democratic ring—with having participated in the republican caucus in nominating Mr. Pratt as Treasurer, and afterwards with having voted for Mr. Compton, the democratic ring candidate—with having aided the ring senators in defeating the bill for repealing the Act authorizing the publication of the laws in newspapers, and by so doing, had proved false to his political obligations and a traitor to his party, and had brought dishonor upon the republicans of Washington County, who had elected him to the Senate.

It further charges him with having a contract to furnish stone to the canal, which was given to him by its president, Mr. Gorman, the head and front of the democratic ring, because he was a senator, and "*had a vote to give in the Senate*," and for no other reason.

The article then concludes by saying, "*The fruits of the contract to furnish stone to lengthen locks on the canal are appearing. Look out for more.*"

The question presented by the demurrer is, whether a publication making such charges as these in regard to the official conduct of the plaintiff is *in law a libel?*

It is well settled that any publication which tends to injure one's reputation, and expose him to hatred or contempt, if made without lawful excuse, is libellous.

It can hardly be necessary to say that such charges as these, against the official conduct of the plaintiff, and the imputation of the base and sordid motives by which such conduct was governed, were calculated to injure his reputation and expose him to the contempt of all honorable men. Independent altogether of the innuendoes, the article on its face shows that these charges were made against the plaintiff, and we have no hesitation, therefore, in saying that the publication is in itself libellous.

If so, the question then is, whether it was published without lawful excuse? And in this behalf it is insisted

the defendants, as proprietors of a newspaper, had the right to criticise and censure the official acts and conduct of the plaintiff as senator, and if the article in question was published in good faith and without malice, honestly believing it to be true, they are not liable for damages. In other words, as proprietors of a newspaper they have the right to say whatever they please in regard to the official conduct of a public man, however false and libellous it may be, and impute to him corrupt and unworthy motives, provided they do so in good faith, and without malice, honestly believing it to be true. No such privilege is recognized by law. The liberty of the press guaranteed by the Constitution is a right belonging to every one, whether proprietor of a newspaper or not, to publish whatever he pleases, without the license, interference or control of the government, being responsible alone for the abuse of the privilege. It is a right which, from the introduction of the printing press down to the year 1694, did not in England belong to the subject. On the contrary, no one was allowed to publish any printed matter without the license and supervision of the government, and it was against such interference on the part of the government, and in favor of the right of the citizen, that this provision found its way into our Bill of Rights.

It has only been within recent years, says an eminent Judge, that the law of libel has gradually developed itself into anything like a satisfactory and settled form, and the full liberty to criticise the conduct and motives of public men, and the measures and policy of government now recognized as lawful, would, half a century ago, have exposed the author to fine and punishment. COCKBURN, C. J., *Wason vs. Walter, Law Rep.*, 4 Q. B., 75.

No one denies the right of the defendants to discuss and criticise boldly and fearlessly the official conduct of the plaintiff. It is a right which, in *every* free country belongs to the citizen, and the exercise of it, within lawful

Negley *vs.* Farrow.

and proper limits, affords some protection at least against official abuse and corruption. But there is a broad distinction between fair and legitimate discussion in regard to the conduct of a public man, and the imputation of corrupt motives, by which that conduct may be supposed to be governed. And if one goes out of his way to asperse the personal character of a public man, and to ascribe to him base and corrupt motives, he must do so at his peril; and must either prove the truth of what he says, or answer in damages to the party injured.

The fact that one is the proprietor of a newspaper, entitles him to no privilege in this respect, not possessed by the community in general. The law recognizes no duty, imposed on him, arising from his relations to the public, to defame and libel the character of any one, and if he does, it is no answer to say, he did so in good faith, and without malice, honestly believing it to be true. Malice in one sense may be said to be an essential element in an action for libel, but not malice in the ordinary sense of hatred or ill will against the person, of whom the defamatory words are spoken. If the publication be in itself libellous, the law in all such cases implies malice; in other words it says, you have no right to libel another, whatever may have been the motive or intention.

In *Campbell vs. Spottiswoode*, *Law Rep.*, 8 *Law Times*, *N. S.*, 201, this privilege was claimed by the editor of the *Saturday Review* as a bar to the action, but BLACKBURN, J., said:

"A writer in a newspaper stands in no other position than any other of the Queen's subjects. Then it was said that, according to the authorities, an honest belief in the truth of the libel was an answer. But that is not so."

CROMPTON, J. "It is said that there is a privilege in newspaper writers to publish comments on public matters, if they write honestly and believe their comments to be true. I am at a loss to see how any one has any right to go beyond

fair comment or discussion, and impute base motives, merely because he believes them to be true."

And such we understand to be the settled law on the subject. And there was no error in overruling the defendants' demurrer to the declaration, and in sustaining the demurrer to their second and third pleas.

- These pleas being out of the way, the case was tried on the general issue plea of not guilty, and under this issue, all the law applicable to the case was fairly submitted to the jury. The article being *per se libellous*, and its publication being established, the only question before the jury, was the amount of damages, which, under all the circumstances, the plaintiff was entitled to recover. In estimating these, they were to consider whether it was published maliciously and wantonly, for the purpose of injuring the character and reputation of the plaintiff; or as editors of a newspaper, honestly commenting upon the official acts and conduct of the plaintiff, and in the belief of its truth. And so the Court instructed the jury.

The defendants' second prayer, however, presents a question of interest, and which in view of the present practice in England, and in some States in this country, requires more than a passing notice ; and that is, in a civil action whether the question of *libel or no libel* is one for the Court to determine, or whether it ought to be submitted to the finding of the jury. Whatever may have been the earlier rule on this subject, the practice seems to be well established now in England, for the Court to instruct the jury, as to what in law amounts to a libel, and then to leave it for them to find whether the publication be libellous or not. Upon an examination of the cases, however, it will be found, we think, that this practice has grown out of the provisions of Mr. Fox's Libel Act in criminal prosecutions for libel, and it is somewhat curious to note some of the results to which this practice has led.

In *Parmiter vs. Coupland, et al.*, 6 *Mees. & Wels.*, 105, decided in 1840, COLERIDGE, J., told the jury that there was a difference with regard to censures on public and on private persons; and having told the jury what, in point of law, constituted a libel, he left it to them to say, whether the publications in question were calculated to be injurious to the character of the plaintiff. The jury found a verdict for *the defendants.* Motion for a new trial was then made, on the ground that the Judge ought to have directed the jury, that the publications were in law libellous. When this motion came up for hearing in the Court of Exchequer, PARKE, B., interrupting the counsel, said, "the practice used to be as you say before Mr. Fox's Act." "That Act," the counsel replied, "is expressly confined to criminal cases." PARKE, B., "It is true ; but it has been the constant practice, in recent times, for the Judge to define what is a libel, and then, leave it to the jury to find, first, whether the writing complained of was published by the defendant; and, secondly, whether it fell within the definition of the offence." The Court held there was no misdirection on the part of the Judge below, but granted a new trial, because the verdict was wrong. In other words, having decided that it was the province of the jury, to find whether the publications were libellous, and the jury having found they were not, the Court granted a new trial, because the jury ought to have found they were libellous.

The case of *Parmiter vs. Coupland, et al.*, was followed in the same year by *Baylis vs. Lawrence, in the Queen's Bench,* 11 *Ad. & Ell.*, 920. Lord Chief Justice ABINGER, before whom the case was tried, left it to the jury to find whether the publication was a libel ; and on motion for a new trial, Lord DENMAN said he had always followed the practice adopted by Lord ABINGER, leaving the jury to find under all the circumstances, whether the publication amounts to a libel. The practice is analogous to the

enactments of 32 Geo. III, chap. 60, "Fox's Libel Act." This Act is not in force in this State, and here the Court has always decided whether the publication is in law a libel, leaving to the jury to find the fact of publication, and such other facts as may be pertinent to the issue ; and we see no good reason for changing the practice. In actions of slander, the question, whether the words spoken *are in themselves actionable,* is a question *of law for the Court,* and for the same reason, when the slanderous words are published, if the publication be free from ambiguity, the question whether they are libellous, is a question of law for the Court.

The other prayers are based either on the theory, that the defendants were exempt from liability, because they were the proprietors of a newspaper, or that the publication was not in law libellous, and these prayers, for the reasons already expressed, were properly refused.

We come now to the questions arising upon the exceptions to evidence. As we have said, the real question in this case was one of damages, and in mitigation of these and to disprove malice in fact, the defendants were permitted to prove certain facts and circumstances, as tending to give color to the charges and statements made in the publication. And for this purpose, they proved that when the bill repealing *"the newspaper law,"* was before the Senate on its passage, the plaintiff voted to commit it to the finance committee, and that with the exception of Mr. Lancaster, all the republican senators voted the other way ;—that in the election of Treasurer, Mr. Compton, the democratic candidate, received two republican votes, and that they were informed one of these votes was cast by the plaintiff; also evidence tending to prove that the plaintiff and one Hawkins had a contract in 1881, to furnish stone to the canal.

Now to rebut this evidence, and to show the *quo animo* with which the defamatory language was used, the

Negley *vs.* Farrow.

plaintiff had the right to prove he did not in fact vote for
Mr. Compton, that there was no arrangement or under-
standing of any kind with Mr. Gorman, the president of
the canal, or with any one else in regard to his vote for
Treasurer; and there was no error, therefore, in the
rulings of the Court in the fourth, fifth and sixth ex-
ceptions.

In considering the third exception it must be borne in
mind that the plaintiff, for the purpose of proving *malice
in fact*, had offered in evidence, other libellous articles of
similar import, published by the defendants subsequent to
the one set out in the declaration.   The defendants had
the right to prove the truth of these subsequent libels,
and to prove all the facts and circumstances surrounding
their publication.   *Wagner vs. Holbrunner,* 7 *Gill,* 296.

On the other hand, it was competent for the plaintiff to
prove that they were not published in good faith, but were
published maliciously and wantonly, for the purpose of
defaming and injuring his character.   With that view and
for that purpose, he had the right to show that before these
libels were published, he had in fact voted for the repeal
of *"the newspaper law,"* and that this fact was known to
the defendants.   The weight to be attached to such evi-
dence was a question for the jury.

In the first exception, the defendants offered to prove
what it cost per perch to deliver stone to the canal under
the contract of Hawkins and the plaintiff, and the price
paid to them for the same; and also that the contract was
given to them without any competition or public notice.
The object of this evidence was to show that the contract
was one highly beneficial to the plaintiff, and was awarded
to them under such circumstances as to excite a reasona-
ble suspicion in regard to its fairness.

In mitigation of damages, the defendants had a right to
prove that the libel complained of was published by them
under an honest conviction of its truth, arising from prob-

able grounds of suspicion, *known to them at the time.*
*Rigdon vs. Wolcott,* 6 *G. & J.,* 413 ; *Wagner vs. Holbru-*
*ner,* 7 *Gill,* 296.   But such probable grounds must have
been known to them at the time of using the defamatory
language, otherwise such evidence would be inadmissible
to repel the presumption of malice arising from the pub-
lication of the libel itself.   The defendants did not, how-
ever, offer to prove that the terms of the contract, or the
circumstances under which it was awarded to the plaintiff,
were known to them at the time of the publication of the
libel sued on, and for this reason the evidence offered by
them was inadmissible.

We come now to the seventh exception.   The defend-
ants had offered evidence, as we have seen, tending to
prove that the plaintiff and Hawkins had a contract to
furnish stone to the canal, and that Mr. Gorman was pres-
ident of the canal, and was chairman of the democratic
State central committee.

.Now to rebut this evidence, and to repel any inference
that might arise from such proof, the majority of the Court
are of opinion the plaintiff had the right to prove that the
price paid for stone under such contract was the same
paid to all other persons under similar contracts.   I have
not been able, however, to persuade myself that such evi-
dence was in rebuttal to anything proved by the defend·
ants.   They had, in the first exception, offered evidence
tending to show what in fact it cost the plaintiff to deliver
the stone under the contract, and how much was paid to
him for the same.   Now, it seems to me, if they were not
permitted to offer evidence from which the jury might
find that the contract was awarded to the plaintiff on the
ground of *favoritism,* neither was it competent for the
plaintiff to prove facts from which the jury might infer it
was a fair and proper contract.·  Such evidence was offered
by the defendants in mitigation of damages and was ex-
cluded, and it does not seem fair that the plaintiff, for the

Negley *vs.* Farrow.

purpose of aggravating damages, should have been permitted to prove the plaintiff's contract to have been a fair and reasonable one. In this view, I am authorized to say, Judge STONE concurs : but a majority of the Court are of opinion for the reasons stated, that such evidence was proper, and the ruling of the Court in this respect must be affirmed.

We have not stopped to consider the questions arising on the evidence in the second exception. In regard to this we all agree it was irrelevant, and therefore properly excluded.

Finding no error in the several rulings of the Court below, the judgment will be affirmed.

*Judgment affirmed.*

(Decided 29th March, 1883.)

STONE, J., delivered the following dissenting opinion :

I am unable to agree with the majority of the Court, that the publication complained of in this case is, in itself, libellous. If it is so, then the defendants are criminally, as well as civilly, liable. They are not only liable in damages to the party injured, but are subject to *punishment* at the hands of the State.

There are, in fact, but three things stated in this publication. 1st. That the plaintiff voted against the nominee of the political party to which he belonged. 2ndly, That the opposite political party had given him a valuable contract; and, 3rdly, That his vote was the result of and caused by that contract.

The senator had the right to vote as he pleased, and it was not a libel to state that he voted for a particular person. The senator was also a citizen, and he had the unquestioned right to engage in the business of furnishing stone to the canal, and it was not a libel to state that he was a contractor for that purpose. Nor can I perceive

in the statement that the vote of the senator was the result of that contract a charge either of bribery or corruption.

Intimate business or social relations do constantly influence votes and voters, without any disparagement to their honesty and integrity, although such votes are given against their party affiliations, and I am not prepared to say that such charges are libellous *per se.*

The whole aim and scope of the article was, in my opinion, an attack on the political, and not on the personal character of the plaintiff. The plaintiff represented his county in the Senate of Maryland, and the defendants were his constituents. His votes were the proper subjects of the fullest and freest criticism among his constituents. The defendants were public journalists, and it was their duty to the readers of their paper to inform them of the political acts of their senator. If upon reasonable inquiry they, the defendants, believed that the senator had voted as the article indicated, then it was their right and their duty so to say, and if, upon the same reasonable inquiry, they honestly believed that the votes so complained of proceeded from certain business intercourse with the opposing political party, it was, I think, their undoubted right to say so, unless they were actuated by malice toward the plaintiff; and whether such malice did exist or not should have been left to the jury.

Taking into consideration the relative conditions of the parties, one a representative and the others constituents, and all the facts surrounding the publication, and the article itself, I cannot think that the publication was such an abuse of the freedom of the press as is contemplated by the 40th Article of the Bill of Rights of this State.