Williams, J.
1. The evidence which the plaintiff in error claims was improperly admitted on the trial, was a statement made by the plaintiff, in the course of his examination as a witness, the substance of which is, that when the article complained of wTas published, his wife was carrying on, in a small way, the shoe and clothing business in the city of Cincinnati, but he did not know that the business was injured by the publication. The objection now made to the admissibility of that evidence is, that the petition contains no allegation of damage to the'plaintiff’s business, and injur j- to that of the wife, could not be made a ground of recovery bjr the plaintiff, if it were averred in the petition. No particular ground of objection was stated when the testimony was given; and the court admitted it, as shown by the bill of exceptions, “subject to instructions to the jury.” In regard to the damages which might be awarded the plaintiff, if the issues should be found in his favor, the court instructed the jury, that they should “take the plaintiff as he stood at the time of the publication, and consider its effect upon his reputation, and the consequences by way of injury, if any, as they appear from the evidence.”
The evidence to which the objection was made, afforded no basis for estimating injury to the -plaintiff’s business, or that of his wife, or for the assessment of damages on account of either. It was not incompetent, as tending to identify the plaintiff, and show his station in life, and positioii in the community of which he was a member; and, as it appears not to have been allowed any different effect, its admission does not, we think, justify the reversal of the judgment. Fowler v. Chichester, 26 Ohio St., 9.
2. The exclusion of evidence, which is assigned for error, consisted in sustaining an objection made by counsel for the plaintiff, during the ^examination of a witness called by the *80 defendant. The witness testified that he had something to do “with the preparation of the list of persons—policemen —set out in the charges made to the governor against the police board.” Then, what occurred, including the objection, the action of the court upon it, and the exception thereto, was, as shown by the bill of exceptions, as follows;
“ Q. {By Mr. Bateman, counsel for defendant) Now, state with what care—or what means you adopted for the purpose of verifying the correctness of the charges made. A. Well, all I had to do with it was comparing the matter which came from the police court records and the committee of one hundred, for the preparation of these charges. First, there came to the committee, and through it to- Mr. McDofigall, just a pencil memorandum of charges against the various officers on the force; that is, a memorandum of the police court record of the charge. Then the committee • were not satisfied with that, and sent and had the police court clerk make out from the records certified copies of every indictment and charge.
“ (Objected to by counsel for plaintiff on the ground that plaintiffs name did not appear in the police court records, and that the testimony is therefore irrelevant.)
“Mr. Bateman—I wish to show the general care taken in the preparation of this list, and the mode in which it was prepared, and that the means adopted as to the correctness of the statement gave reasonable ground for believing that the statements were correct. That the committee of one hundred attempted to make a careful investigation of the matter, and enumerated this name among the balance.
“(Objection sustained; to which the defendant, by his counsel excepts.)”
The plaintiff in error complains, that by this action of the court, it was denied the right to show the care exercised by the committee in making up the list of policemen mentioned in the charges filed with the governor against the police board, which, it is contended, it was competent to prove, as it tended to show the good faith of the defendant, and thus establish that the publication complained of was privileged; or, if it did not have that effect, it was, at least,. *81 proper evidence in mitigation of damages. It does not definitely appear to what particular statement of the witness, the objection was made. It was not interposed until after the witness had made the statement that the committee “had the police court clerk make out from the police court records certified copies of every indictment and charge.” And, as the objection is based upon the ground that “the plaintiff’s name did not appear in the police court record,” and no part of the testimony given was ruled out, it may be inferred, the objection was to evidence of the contents of the records, or of copies of them. However that may be, it appears from the bill of exceptions, that the witness was afterward re-called by the defendant, when his testimony proceeded as follows:
“ Q. (By Mr. Batemari) In view of the statement of Mr. McRae, I will put this question, supposing that the objection to the question has been somewhat changed by the testimony of McRae. I will ask you, Mr. Kemper, whether previously to the filing of the charges, careful examination was made to ascertain whether or not the charges as to the officers enumerated in the complaint filed with the governor were true; and if so, what steps were taken to verify the correctness of that list.
“ The Court—It has a connection. The objection is overruled and he may answer the question.
“ A. The question calls for what? (Stenographer reads question.) Well, I know that great care was taken in the preparation of that list, and the committee sent to the clerk of the police court, and had made a certified copy—
“Mr. Gerard—We demand that copy.
“ Q. Now, the question is what the committee did.
“Mr. Gerard—If your Honor please, there is no inference to be drawn here that Mr. Moloney is on that list.
“ Q. Is that list there? A. It is not in the office; I haven’t seen it for two years.
“ (Counsel 'for defendant objects to the testimony unless the list be furnished them, and upon the witness stating that it cannot be produced, the court rules that all reference to the list must be excluded from the testimonj'-.)
*82 “ Q. You need not make any reference to the list, but what care and how much time was consumed, and who was employed in endeavoring to get a correct list ? A. I know that great care was taken to get a correct list, and to that end the police court clerk was employed to search the record of the police court and find from these records—
“ O. I don’t care for that, but how much time was consumed in verifying and ascertaining the correctness and justice of the statements in reference to the policemen ? A. As I said before, my recollection is the charges were in preparation three or four weeks, and I know they were very careful not to put any one in that list except those the charges against whom were good, and sustained by evidence they had searched for and obtained.
“ Q. They thought they had verified the correctness of the list before the}'— A. Filed the charges with the governor.”
Since the testimony as first given by the witness was not taken from the jury, and the defendant had the benefit of its subsequent repetition, with additions thereto, under the sanction of the court, precisely in what manner the defendant was prejudiced, in any degree, is not apparent.
3. The bill of exceptions discloses, that when the court had concluded its charge to the jury, the defendant presented to the court, the following special charges and asked that they be given to the jury:
“1. The matter to which the publication in question relates, is one of general public interest, as pertaining to the conduct and qualification of public officers, and is therefore what is known and denominated in the law as a privileged publication; and unless the plaintiff shall establish by competent evidence the existence of actual malice in its publication, the defendant will not be responsible.
“ 2. The jury are authorized, in determining the existence of malice or ill will in the publication, to look into all the circumstances in evidence tending to throw light upon the motive and purpose of the defendant in the publication.
“ 3. The discussion of public questions as affecting the management of public affairs and the conduct of public offi *83 cers, is the right of the defendant, as it is of every citizen, and its motives in such discussion are presumed to be good until the contrary shall be shown; the burden of proving the existence of malice and bad faith rests upon the defendant. (?)
“ 1. The mere fact that it may have made, in course of such discussion, a mistake in fact or opinion, that may injuriously affect the reputation of an officer, raises no presumption of malice, either in fact or in law.
“5. To entitle the plaintiff to recover, the statement complained of must not only' be falsely, but must be maliciously made, and the mere fact that it was false raises no presumption that it was also malicious, but it devolves upon the plaintiff to prove the existence of actual malice or intent to injure plaintiff on part of the defendant in addition to proof of falsity of the statement.
“ 6. It is the right and duty- of the citizen to watch closely the management of government and the conduct of its officers, and to freely, fairly, and publicly discuss them, and he is not liable, in the absence of actual malice on his part, for any injury' to the reputation of a public officer resulting from statements of opinion or fact made in good faith and upon probable grounds of belief.
“ 7. The existence of charges against a public officer as to his fitness or conduct in office makes it both the right and duty' of the citizen to canvass and examine as to the truthfulness of the charges, and the necessary' measures of relief in case they' should be found to be true. The right to refer to such charges and state them, is involved necessarily in the right to discuss and examine them, both rights being subject always to the limitation that they shall be exercised without malice and in good faith.”
The court refused to give in charge the instructions re., quested, except the 2nd proposition which is as follows, to-wit: “The jury are authorized in determining the existence of malice or ill will in the publication, to look into all the circumstances in evidence tending to throw light upon the motive and purpose of the defendant in making it.” The instructions requested, it will be noticed, consist of a series of proposit *84 ions, more or less dependent upon eadh other for their full meaning; and the court was requested to give them as a whole. .«Under the well settled rule, if any one of the series contains a proposition that is unsound, it was not error to refuse them all; and some of them, we think, were of that character. For instance, we do not understand it to be the law, as asserted by the first instruction requested, that because a publication containing libelous words relates to a question of public interest, it is therefore necessarily privileged, and casts lipón the plaintiff suing for the libel, the burden of proving actual malice, in order to recover. Whether it be privileged, or not, must depend upon the circumstances of the publication; as well as the language employed. Writers upon the subject, include all privileged publications within two classes; those which are absolutely privileged, and those in which the privilege is but qualified. There are not many of the first class, nor is it desirable there should be. They embrace such only, as are necessary to the efficiency of the public service, and the due administration of justice; and are confined to the business of legislative bodies, reports upon military affairs by officers to their superiors, and judicial proceedings. In such cases the privilege constitutes an absolute bar to the action. The immunity is afforded upon the ground, that it is to the public advantage that there should be no trammel upon the freedom of the conduct of public affairs. This privilege is expressly extended to proceedings of the General Assembly of the state, by the provision of the constitution, that the members “shall not be questioned elsewhere,” for “any speech or debate, in either house.” Publications having a qualified privilege are more numerous, and are those where the privilege arises out of the circumstances of the publication. Good faith in the publication, and the exercise of reasonable diligence to ascertain the truth of its statements are essential to the privilege, which is said to be qualified, because the plaintiff may recover, if actual malice be shown, notwithstanding the existence of the circumstances which would otherwise make the publication a privileged one. Included in this class, are the reports of judicial and leg *85 islative proceedings, and communications, which one person is under an obligation to make to another, or in the subject matter of which they have mutual interests. It is not contended that the publication in question was one of absolute privilege; and the facts which the defendant claims made it one of qualified privilege not appearing in the petition, it became necessary to plead them by way of defense. They were so pleaded in the second defense of the answer, and were put in issue by the reply; and being so in issue, it was not within the province of the court to instruct the jury, that the publication was privileged, without regard to what the proof before them might be, or how they might find upon those issues. Whether the facts which gave the publication the privileged character claimed for it, were established by the evidence, was a question for the jury; and they were so instructed. If the facts alleged in the answer were sufficient, in case they were proven, to establish the privilege claimed for the publication, an instruction that if the jury should find them to be true the publication was privileged, would have been unobjectionable. But, in the absence of such facts, the publication was libelous per se, and the plaintiff made out a prima facie case when the publication was proven, for the law presumes that it was false and malicious; and then, it was incumbent on the defendant to enter upon his defense; and so the court, not improperly, we think, charged the jury. The first of the series of instructions -requested, asked the court to assume that the publication related to a matter of public interest, and was therefore privileged; and, if given, would have required a verdict against the plaintiff, unless he proved actual malice on the part of the defendant, and thus relieved the defendant of the burden of proving any of the allegations of its answer, notwithstanding they were distinctly denied. By that instruction, the privilege of the publication is not made to depend upon the good faith of the party making it, or upon a reasonable belief in the truth of its statements, or upon any other fact than that it was of public interest; -while, by the sixth proposition of the series, the court was requested to instruct the jury that the *86 publication was privileged, if made “ in good faith, and upon probable grounds of belief.” The jury could not well have followed both instructions. It is said, however, that the evidence given on the trial, rendered the instructions pertinent and proper. The publication which the plaintiff gave in evidence, containing the libellous matter complained of, omitting the names of persons, and statements concerning them that are not important, is as follows:
“ THEIR DEFENSE—The Police Commissiofiers will Shift their responsibilities to the Men who Endorsed and Recommended Unfit candidates for the Police.
“An unusual amount of business is just now absorbing the attention of the clerical force of the Police Department, and inquiry develops the fact that Clerk Bender and those under him are engaged in preparing the defense of the Police Commissioners to the charges brought against them by The Committee of One Hundred. The investigation will begin before Governor Foraker, February 3, and hence the bustle. The charges that the Commissioners have appointed unfit and improper men on the police force will be defended upon the basis that the appointments were made upon the requests and endorsements of prominent politicians and business men of the city. Upon these men it will be attempted to shift the responsibility for the re-appointment of the men who have brought disgrace and shame upon the entire police force. The extent and importance of this remarkable endorsement of notorious rogues and criminals bjr respectable and law abiding citizens, for guardians of the lives and property of the people, seems almost incredible, yet nevertheless, the records and petitions filed in the office of the Chief of Police substantiate it. The Commissioners will further claim that the pay of patrolmen— $61. per month—and their duties áre such that bankers, professional men, merchants, etc., can not afford to assume the duties for the compensation. As a consequence prop erty-holders and moneyed men avoid this method of making a livelihood. It is further claimed by the Commissioners that it is impossible for them to have a personal knowledge of every man who applies for a position on the force, and *87 hence thejr. are bound to rely wholly or in part on the character and business standing of those citizens who accompany their official endorsements with importuning personal requests. The Commissioners further claim that when an officer was found incompetent for his place, either through drunkenness or arrogance, and was suspended by them for the same, they would be besieged immediately afterward by the man’s friends, who would both request and demand the reinstatement of the offender, and when a refusal was made, would go away maligning the Commission, and creating a public feeling against them. As examples of recommendations of policemen, alleged to be unfit by The Committee of One Hundred, are the following:
“ J. J. Moloney, a third policeman mentioned, is said to have been in the work-house, and to have had a general criminal record. He was endorsed by Wm. Goodheart, of the firm of Goodheart, Bros. & Co. Third street clothiers, and P. Gilligau.”
The charges agaimg: the Police Commissioners, which were filed with the Governor, by the committee referred to, previous to the publication, contained the statement that the Commissioners had appointed on the police force, and continued to appoint on the force, “a large number of men who are wholly unfit to act as police officers, some of whom are gamblers, some of whom have served terms in the workhouse, in the penitentiary, in the jail, have been inmates in the House of Refuge, some of whom have been keepers of houses of prostitution, and a large number of whom have been discharged by said Board for drunkenness and other offenses repeatedly committed, and have been reinstated notwithstanding said offences. Among the number who have thus been appointed on said force, and who are wholly unfit to occupy said positions, and -whose unfitness and character was known to said Commissioners at the time of their appointment, are the following:”—(Here follows a number of names, among them John J. Moloney.)
It was proven on the trial, that the plaintiff was a policeman of Cincinnati at the time of the publication, and had been for a long time prior thereto; that he' had never been *88 in tlie workhouse, nor 'charged with any crime, or misconduct ; and that his general reputation was good. The evidence also tended to prove that the truth could have been easily ascertained b}' the employe of the defendant who wrote the article, upon proper inquiry, and that he had information of the facts before the article was published. The evidence was relevant to the issues joined by the pleadings, but not such, we think, as to make it error to refuse the instructions which the defendant requested the court to give in charge to the jury. If it be conceded that the inquiry instituted before the Governor, so far partook of the nature of a judicial investigation that a proper publication of the proceedings would be privileged, the privilege cannot be claimed for the article of which the plaintiff complains; for, to be within the protection of the rule, it is necessary that the publication contain an accurate and impartial report of what actually occured, without change or addition; while the publication in this case is not, nor does it purport to be, an answer, or paper presented or use^l in the proceeding, or the report of any step taken in its. progress; but is only what the writer supposed would be filed, and, as .the evidence tended to show, was an incorrect statement of the facts in his possession.
The real ground on which the alleged privilege is claimed in argument is, that inasmuch as the investigation of the conduct of the Police Commissioners was a matter of public concern in the city of Cincinnati, and the character of their appointees on the police force was incidentally involved, the defendant, so long as it was not actuated by malice, had the right to publish as an item of news, and in the public interest, any criticism, comment, or statement concerning the personal character and standing of the plaintiff, as well as his official action and conduct as a policeman. It is said in support of this position, that the press owes a duty to the public, to keep it informed about its public servants, to the end that abuses may be corrected, and the public welfare subserved; and, that the press, in the performance of that duty, is privileged to speak as freely of the private character of the person holding the office, as of his official conduct *89 and character; that the right to so speak of the latter, includes the same liberty as to the former. It is not denied that the right goes to the extent of free and full comment and criticism on the official conduct of a public officer; and there are some cases which maintain the doctrine as broadly as claimed. These cases declare that one who offers his services to the public as an officer, thereby surrenders his private character to the public, and is deemed to consent to any imputation, however false .and defamatory, if made in good faith. We do not think the doctrine either sound or wholesome.' In our opinion, a person who enters upon a public office, or becomes a candidate for one, no more surrenders to the public his private character, than he does his private property. Remedy by due course of law, for injury to each, is secured by the same constitutional guaranty, and the one is no less inviolate than the other. To hold otherwise, would, in our judgment, drive reputable men from public positions, and fill their places with others having no regard for their reputation; and thus defeat the object of the rule contended for, and overturn the reason upon which it is sought to sustain it. That rule has not been generally adopted in this country. Hamilton v. Eno, 81 N. Y. 116; Lewis v. Few, 5 Johns. 1; Curtis v. Mussey, 6 Gray, 261; Barr v. Moore, 87 Penn. St. 385 ; Kimball v. Fernandy, 41 Wis. 329; Sweeny v. Baker, 13 W. Va. 158; Corn v. Wardwell, 136 Mass. 164; Negley v. Farmer, 60 Md. 158; State v. Schmitt, 49 N. J. L. 579; Rearich v. Wilcox, 81 Ill. 77. And the converse of it has hitherto obtained in this state. Seely v. Blair, Wright’s R. 358, 683.
4. The court instructed the jury that the use of the words “is said,” in the publication declared on, did not affect its libelous character; to which exception was taken by the defendant. No request was made to charge that the use of the words might go in mitigation of damages, and whether they might or not, is not a question before us; they certainly do not make the publication any the less actionable. Haines v. Welling, 7 Ohio, 253.
Other exceptions to the charge are disposed of by what has already been said, and the objections to others of the *90 propositions embraced in the instructions requested by the defendant will be sufficiently apparent without further discussion of them. We find no error in the record, and the

Judgment is affirmed

Dickman and Minshale, JJ., dissent.