8430

BLACK v. THE STATE CO.

LIBEL—ISSUES.—When criticism and statement cease to be fair and honest and become libelous is usually for the jury and can rarely be decided on demurrer. Where a newspaper threatens to destroy plaintiff's business and in pursuance thereof falsely and maliciously charges that plaintiff refrained from making an open charge against a candidate for public office at the proper time and afterwards resorted to secret, insidious and discreditable charges when it was too late for the candidate and his friends to refute them, the issues whether the limits of free criticism had been passed in the discussion of public affairs and the plaintiff unjustly exposed to obliquy and disgrace should be sent to the jury. Difference between criticism and defamation stated.

MR. JUSTICE WATTS *thinks the allegations do not make out a case of libel.*

*Hubbard* v. *Furman University,* 76 S. C., 510, *distinguished from this case.*

2. REHEARING refused.

Before COPES, J., Richland, June, 1911. Reversed.

Three actions, (1) John E. Black against The State Company; (2) E. O. Black against Same; (3) Fingal C. Black against Same. Plaintiffs appeal.

*Messrs. Rembert & Monteith,* for appellants, cite: 71 S. C. 112; 2 Bail. 579; 6 Rich. 431; 79 S. C. 510; 4 Am. D. 351; 66 Am. D. 479; 14 Am. St. R. 874; 46 Am. St. R. 502; 214 U. S. 188; 124 Ia. 124; 13 Am. & Eng. Ann. Cas. 376; 100 N. W. 897.

*Messrs. Lyles & Lyles,* contra, cite: 63 S. C. 530; 76 S. C. 511; 51 Am. St. R. 453; Slander & Libel 186; 1 N. & McC. 347; Odgers on Libel and Slander 34, 35; Newell on Libel and Slander, 566, 575; 51 Am. St. R. 446; 113 Eng. Com. L. R. 769; 113 App. Div. (N. Y.) 510; 173 Fed. 227; 60 Md. 158; 63 S. C. 252.

The opinion in this case was filed on January 10, but remittitur held up on petition for rehearing until

February 4, 1913. The opinion of the Court was delivered by

MR. JUSTICE FRASER. This is an action for libel. The following is the complaint:

"The plaintiff above named complaining of the defendant above named alleges:

1. "That the plaintiff is a citizen and resident of the city of Columbia, county of Richland, and State of South Carolina, and engaged as a plain business man in the business of real estate and insurance, and also as secretary and treasurer of two building and loan companies in the said city of Columbia.

2. "That the defendant is a corporation duly chartered under and by virtue of the laws of the State of South Carolina, and its principal place of business being located in

Columbia, in the said State, and its principal business being the publication and circulation of a daily newspaper known as 'the State,' which said newspaper has a wide circulation in the said city of Columbia and throughout several States, including the State of South Carolina.

3. "That the said plaintiff, while exercising his rights as a citizen on Tuesday, May 3, 1910, which was election day in the said city of Columbia, was threatened and warned away from the voting precinct in the said city of Columbia by the defendant herein, which threats and warnings to the plaintiff consisted in a statement by the defendant that if the said plaintiff did not leave the voting precinct and cease his efforts to influence voters to vote against one Charles C. Wilson, who was at that time a candidate for councilman for the said city of Columbia, that the said defendant would write up the said plaintiff in the newspaper known as 'The State,' and thereby ruin the business of the said plaintiff.

4. "Subsequent thereto, to wit, on May 4, 1910, the newspaper known as 'The State,' published and circulated by the defendant herein contained the following news item on page 1:

" 'Wilson defeated by fifty votes. He was fought at the polls by Fingal C. Black's friends. Vote nearly as large as that of the week before.

" 'The defeat of C. C. Wilson was deplored by his friends last night. A terrific fight had been sprung on him in the last 24 hours, and before his friends could offset the attack, the voting was on. Brothers of Fingal C. Black were at the polls yesterday urging voters to cut Mr. Wilson. It will be recalled that there was a bitter controversy between Mr. Wilson and Mr. Black 18 months ago, and Mr. Wilson was sustained by council.'

"That the plaintiff herein is one of the brothers of Fingal C. Black referred to in the said paragraph.

5. "That in the same issue of the above named paper appears the following editorial on page 4 of the said newspaper:

" 'Columbia's commission. The commission to manage the municipal affairs of Columbia under the new form of government was completed yesterday by the election of three councilmen, Messrs. Blalock, Steiglitz and Keenan. In the first primary W. H. Gibbes was elected mayor and R. W. Shand, councilman.

" 'The State regrets the defeat of Charles C. Wilson and Charles Narey, because it believes their services to the people of Columbia would have been exceptionally valuable. It regrets, too, the methods, unfair and discreditable, that were used to compass the defeat of Mr. Wilson. We do not recall a parallel in Columbia.

" 'But the commission is elected, and will receive from us the most cordial support in its work for Columbia. We have confidence in the ability and in the progressiveness of the majority of the board, and faith in the ability of our new system to get the best out of all councilmen. We hope the regrets now entertained at the loss to the commission of the services of Wilson and Narey will be speedily removed by the efficiency of the work performed by the councilmen chosen in their stead.

" 'Columbians have their faces turned toward a period that has promise of exceptionally great prosperity. Opportunity, in several guises, is knocking at our doors. The economical, progressive, energetic, management of a city is the surest guarantee of peace, prosperity, and happiness. Columbia now has the way opened for good government, and The State promises its most cordial support to each and every member of the new commission in an effort to make Columbia conspicuous among the cities of the southeast for the wise administration of her affairs.

" 'A new order of things has come. Past policies will be abandoned, and a strict accounting exacted. Columbia shall have good government, and shall take her place at the very front.'

"That the said editorial in connection with the local on page 1 of the said newspaper as above set forth directed public attention to the plaintiff herein and denominates his methods of fighting the said Mr. Wilson as unfair and discreditable, and that the said libellous publication was malicious and false, and intended to impeach the honesty, integrity and reputation of the plaintiff herein, and, therefore, to expose him to public hatred, contempt, ridicule and obloquy and to injure him in his business and occupation.

6. "That subsequent to the libellous publication above set forth on the morning of May 5, 1910, the said defendant published the following editorial on page 4 of 'The State:'

" 'Assassination at the polls. Doubtless Fingal C. Black and his relatives are pleased with the part they played on Tuesday, and doubtless they are not concerned in 'The State's' conception of that part. Nevertheless as they took a public position contrary to the will of nearly seven hundred Columbians, it is our privilege, in behalf of those 682 voters and in behalf of all men who wish a fair fight, and a square deal in politics, to express the opinion that their policy was unfair, and an injustice and offense to this community, which is striving for good government..

" 'The details of the enmity of Mr. Black to Mr. Wilson are not now material. It is sufficient for the public understanding to know that while working on Columbia's streets as engineer, under Mr. Wilson, a disagreement arose, and it became impossible for the subordinate to longer hold his place. Then, if we remember, Mr. Black made charges against the efficiency of the work done under Mr. Wilson's direction. Council took up the charges, and a committee made exhaustive examination of the work. That committee

was not a 'Wilson' committee.    It is a coincidence that one of its members, Mr. Keenan, gets to council as the result of the attacks made upon Mr. Wilson, when those attacks were declared by Mr. Keenan, in his official capacity, to be without merit or justification.

" 'The Wilson-Black incident is so old as to be forgotten, or but of indistinct memory to most busy people.    It was thrashed out, and settled in Wilson's favor, the public sustaining action of council.    Nothing more is heard of it. Meantime the form of government is changed and many Columbians, with and without property, and seeking the best men to do the city's work, are anxious that Wilson's services be secured.    He is asked to be a candidate, and consents.    There is a campaign meeting, and he addresses the people.    There are editorials and letters published in his favor.    For two weeks no word is heard against him.

" 'But on election day the personality of the Black family is conspicuous at the polls, and its members work 'against Wilson.'    What they whisper into the ears of the uninformed we do not know; Wilson nor his friends may not know.    But we do know there is no chance for any man against that sort of organized insidious attack.

" 'Now, we hold that the people of Columbia had rights in this matter.    Fair dealing to Wilson demanded notice of attack, but we'll let that pass.    If there was anything against Mr. Wilson that might render him unfit to hold a position that hundreds considered him peculiarly qualified to hold, it was the right of Columbians to be informed of the charges in time for investigation.    It was the right of the business men who wished the services of Mr. Wilson on street work, or in other important departments, to know Mr. Black's complaint, if he had one.    With a large field from which the comparatively indifferent voters may pick candidates, few men are so inherently strong and popular as to escape assassination at the polls when a number of men organize

for secret attack on one particular man. The object of the assault is deprived of any chance of defense, and his friends are helpless. They can not defend against unknown attack. They can not say a man is being victimized because he has performed his duty to the public; nor can they know whether the charges are well founded so they may withdraw their friend from slaughter.

" ' We hope the public sentiment will so condemn this policy that it will never mar another election in this town.'

7. "That the plaintiff herein is a brother of Fingal C. Black and one of the relatives referred to in the above editorial headed 'Assassination at the Polls.'

8. "That the said publication above set forth was wilful, malicious and false, and tended to impeach the honesty, integrity and reputation of the plaintiff, to injure his character and reputation, and to expose him to public hatred, contempt, ridicule or obloquy, and to injure his business or occupation, and by reason thereof the said plaintiff has been damaged in the sum of fifty thousand ($50,000) dollars.

"Wherefore, the plaintiff prays judgment against the said defendant in the sum of fifty thousand ($50,000) dollars, and for the costs of this action."

The complaint in the case of E. O. Black is identical with the complaint in the John E. Black case, last above quoted, with the exception of paragraph one, which, in the E. O. Black case, is as follows:

" 'That the plaintiff is a citizen and resident of the city of Columbia, county of Richland and State of South Carolina, and his business being that of a builder and contractor.'

The complaint in the case of Fingal C. Black differs from the complaint in the John E. Black case in that paragraph one alleges plaintiff to be "by profession a civil engineer;" it does not contain the allegation appearing in paragraph three of the John E. Black complaint, and reading as follows:

"Was threatened and warned away from the voting precinct in the said city of Columbia by the defendant herein, which threats and warnings to the plaintiff consisted in a statement by the defendant that if the said plaintiff did not leave the voting precinct and cease his efforts to influence voters to vote against one Charles C. Wilson, who was at that time a candidate for councilman for the said city of Columbia; that the said defendant would write up the said plaintiff in the newspaper known as 'The State,' and thereby ruin the business of the said plaintiff;" and the allegations found in paragraph seven of the John E. Black complaint are entirely omitted.

The defendant demurred to the complaints on the ground that they do not state facts sufficient to constitute a cause of action. The demurrer was sustained and the complaints dismissed. From the order sustaining the demurrer the plaintiff appealed. This is a demurrer and for the purposes of the demurrer, the allegations are taken as true.

The appellant states four tests as to the distinction between legitimate criticism and actionable libel, the second of which (quoting from Odgers and also from Newell on Slander and Libel) is "2. Criticism never attacks the individual but only his work."

The complaint alleges that the plaintiff was threatened and warned on May 3d that if the plaintiff did not leave the voting precinct, and cease his efforts against Wilson, the defendant would write up the plaintiff in the newspaper known as "The State" and thereby ruin the business of said plaintiff. That on the 4th and 5th articles appeared censuring the plaintiff. That on May 5th there appeared an article in which the plaintiff's conduct is thus characterized: "He (Wilson) is asked to be a candidate and consents. There is a campaign meeting and he addresses the people. There are editorials and letters published in his favor. For two weeks no word is heard against him. But

on election day the personality of the Black family is conspicuous at the polls and the members work against Wilson. What they whisper into the ears of the uninformed we do not know; Wilson nor his friends may not know. But we do know there is no chance for any man against that sort of organized insidious attack." The complaint alleges that this statement is maliciously untrue.

In *Flood* v. *News and Courier Co.,* 71 S. C. 116, 50 S. E. 641, this Court says: "Written words tending to diminish the respectability of a person to whom they relate and to expose him to disgrace and obloquy, although they do not impute the commission of a crime, are libelous and actionable, although no special damages are alleged or proven."

It must be assumed under the demurrer that the defendant threatened to destroy plaintiff's business, and in pursuance of that purpose falsely and maliciously charged in its paper that the plaintiff refrained from making an open charge against a candidate for public office at a proper time, and afterwards resorted to secret, insidious, and discreditable charges, when it was too late for the candidate and his friends to refute them. Taking these allegations as true, the question would be for the jury to determine whether the limits of fair criticism had been passed in the discussion of public affairs and the plaintiffs unjustly exposed to obloquy and disgrace. The question when criticism and statements cease to be fair and honest, and become libellous is usually for the jury and can rarely be decided on demurrer.

It is true that a demurrer was sustained to the complaint in *Hubbard* v. *Furman University,* 76 S. C. 510, 57 S. E. 478. But that was a case where the only reasonable meaning that could be given to the publication was a meaning free from libellous import; and the Court thus stated the law: "In determining whether words are libellous, they are to be given their ordinary and popular meaning; and if they are susceptible of two meanings, one libellous and the other

innocent, the former is not to be adopted and the latter rejected as a matter of course, but it must be left to the jury to determine in what sense they were used. *Davis* v. *Johnson,* 2 Bailey 579; *Marshall* v. *Gunter,* 6 Rich. 431. If the words are plainly libellous, or wanting in any defamatory signification, it is the province and duty of the Court to say so. Where the meaning is doubtful, it is the province of the jury to decide. Note, 4 Am. Dec., 351; *Barrows* v *Bell,* 66 Am. Dec., 479; *Hays* v *Press Company,* 14 Am. St. 784; *St. James Military Academy* v. *Gaiser,* 46 Am. St. 502." See also, *Triggs* v. *Sun P. & P. Asso.* (N. Y.), 103 Am. St. 841 and note; *Holmes* v. *Clisby,* 121 Ga. 241, 48 S. E. 934, 104 Am. St. 103 and note, *Burt* v. *Advertiser Newspaper Co.* (Mass.), 13 L. R. A. 97 note; *White* v. *Nichols,* 3 How. 3, 11 Law Ed. 591; Newell on slander, 290.

The demurrers must be overruled and the judgment reversed.

MR. JUSTICE WATTS, *dissenting.* The appeals in three cases are from orders of his Honor, Robert E. Copes, dated June 7, 1911, sustaining the demurrers to and dismissing the complaints in each of the above causes. The complaints allege that the defendants published libellous and defamatory matter concerning plaintiffs' action in a municipal election held in the city of Columbia, to choose commissioners to govern the city under the new commission form of government. The only difference between the complaint in the John E. Black case and the E. O. Black case is that John E. Black is alleged to have been "engaged as a plain business man in the business of real estate and insurance and also as secretary and treasurer of two building and loan companies, in said city of Columbia," while E. O. Black it is alleged "his business being that of a builder and contractor." Fingal C. Black is alleged to have been,

"by profession a civil engineer." John E. Black and E. O. Black were brothers to Fingal C. Black.

It appears from the complaints that plaintiffs had taken an active part in defeating one Charles C. Wilson, a candidate for commissioner and the publications were criticisms of the manner in which the plaintiffs had accomplished their purpose.

The defendant demurred to the complaint on seven grounds. The first ground of defendant's demurrer was abandoned on Circuit. The other grounds of the demurrer were upon the ground that the publications were criticisms and expressions of opinion of the acts and conduct of the plaintiffs in a matter of public concern and were not, therefore, libellous or defamatory. His Honor sustained the demurrers and dismissed the complaints. Plaintiffs appeal and allege error on the part of his Honor in three exceptions. The sole question raised by these exceptions is whether the Circuit Judge was correct in holding that it appears from the face of the complaints that the alleged libellous or defamatory matter was criticism and expression of opinion of the acts and conduct of plaintiffs in a matter of public concern and was not, therefore, defamatory, and did not tend to impeach the honesty, integrity or reputation of the plaintiffs or to injure their character or expose them to public hatred, contempt, ridicule or obloquy or to injure them in their business, or occupation or otherwise.

By the argument of appellants, no serious claim is made that the publications were defamatory upon the plaintiffs in their business and occupation, and the only question in the case is whether the publications are libellous *per se*. This simplifies the issue by reducing it to the question of libel or no libel.

The general definition of libel given by our Courts is found in *Smith* v. *Bradstreet,* 63 S. C. 530, 41 S. E. 763, and quoted with approval in *Hubbard* v. *Furman University,* 76 S. C. 511, 57 S. E. 478: "A libel is malicious defam-

ation, expressed either by writing or printing, or by signs, pictures, effigies or the like, tending to blacken the memory of one who is dead, or to impeach the honesty or integrity or reputation, or publish the natural or alleged defects of one who is alive, and thereby to expose him to public hatred, contempt, ridicule or obloquy, or to cause him to be shunned or avoided, or to injure him in his office, business or occupation."

Under the rule of pleading as laid down in this case, *supra,* and applying that rule of pleading to the complaints in these cases at bar there is no allegation of any facts tending to give the publications any meaning beyond the ordinary and popular meaning of the words used as explained by the entire publication, and it is for the Court to say whether the words are defamatory or not. In this same case of *Hubbard* v. *Furman University, supra,* the Court says: "In determining whether words are libellous, they are to be given their ordinary and popular meaning; and if they are susceptible of two meanings, one libellous and the other innocent, the former is not to be adopted and the latter rejected as a matter of course, but it must be left to the jury to determine in what sense they were used. *Davis* v. *Johnson,* 2 Bailey 579; *Marshall* v. *Gunter,* 6 Rich. 431. If the words are plainly libellous, or wanting in any defamatory signification, it is in the province and duty of the Court to say so. Whenever the meaning is doubtful, it is the province of the jury to decide. Note, 4 Am. Dec. 351; *Barrows* v. *Bell,* 66 Am. Dec. 479; *Hayes* v. *Press Company,* 14 Am. St. 874; *St. James Military Academy,* 46 Am. St. 502."

Were the four different publications by the defendant in reference to plaintiffs' conduct in the municipal election libellous or in the way of legitimate criticism fair and privileged in a matter of interest to the public and an expression as to their conduct in a public matter? The Courts have recognized the right to criticise and discuss men who become candidates for public honors. In *Myrant* v. *Richardson,* 1 N.

& M. 347, plaintiff alleged, when a candidate for congress, defendant spoke and published of plaintiff that plaintiff's mind was weak and that plaintiff could not be depended on. Court sustained a demurrer to the complaint, which on appeal was sustained and the Court said: "It was not pretended that those words spoken of a private individual would have been actionable. And I am not aware of any principle of law or Constitution by which a person, by proclaiming himself a candidate for congress, becomes so far elevated above the common level of mankind as to entitle him to any exclusive privileges. On the contrary, when one becomes a candidate for public honors he makes profert of himself for public investigation. All his pretensions become proper subjects of inquiry and discussion. He makes himself a species of public property, into the qualities of which every one has a right to inquire, and of the fitness of which every one has the right to judge and give his opinions. The ordeal of public scrutiny is many times a disagreeable and painful operation. But it is the result of that freedom of speech which is the necessary attribute of every free government, and is expressly guaranteed to the people of this country by the Constitution. The same may be said of the freedom of speech as of the press: 'That among those principles deemed sacred in America; among those sacred rights considered as forming the bulwark of their liberty, which the government contemplates with awful reverence, and would approach with the most cautious circumspection, there is no one of which the importance is more deeply impressed on the public mind. That this liberty is often carried to excess, that it sometimes degenerates into licentiousness, is seen and lamented, but the remedy has not yet been discovered. Perhaps it is an evil inseparable from the good with which it is allied; perhaps it is a shoot which cannot be stripped from the stalk without wounding vitally the plant from which it is torn.' "

It is a well settled rule of law that a fair and reasonable criticism upon the public acts of officers, or candidates for a public office, is allowed, provided, it contains no reference or reflections defamatory to his private affairs, character or business. Damages must be pecuniary, not sentimental. In the complaints in the cases there is no allegation that plaintiffs have suffered any loss of business or suffered in a social way by being ostracised or prevented from being invited anywhere. Mental anguish will not suffice as some people are more sensitive than others. What would annoy and cause anguish to one person would not effect another. In all cases of tort, damages must be proximate, not remote. The words published are not defamatory *per se.* If they were libellous *per se* no proof of actual injury would be necessary to recover something. The law in such cases presumes that he has suffered some injury by reason of the publication. In Odgers on Libel and Slander 34: Title, "Fair and *bona fide* comment and criticism," we find: "Every one has a right to comment on matters of public interest and general concern, provided he does so fairly and with an honest purpose. Such comments are not libellous, however severe in their terms, unless they are written intemperately and maliciously. Every citizen has full freedom of speech on such subjects, but he must not abuse it. This branch of law is but of recent growth. Cockburn, C. J., says in *Wesson* v. *Walter:* 'Our law of libel has, in many respects, only gradually developed itself into anything like a satisfactory and settled form. The full liberty of public writers to comment on the conduct and motives of public men has only in very recent times been recognized. * * * Yet who can doubt that the public are gainers by the change and that, though injustice may often be done, and though public men may often have to smart under the keen sense of wrong inflicted by hostile criticism, the nation profits by public opinion being thus freely brought to bear on the discharge of public duties? * * * The right to comment upon

the public acts of public men is the right of every citizen. and is not the peculiar privilege of the press. But newspaper writers, though in strict law they stand in no better position than any other person, are generally allowed greater latitude by juries. For it is in some measure the duty of the press to watch narrowly the conduct of all government officials, and the working of all public institutions, to comment freely on all matters of general concern to the nation, and to fearlessly expose abuses. * * * Every one of the public is entitled to pass an opinion on every thing which in a way incites public attention. Those of the public whose opinion on such matters is best worth having are called critics. From their education, ability or experience, they can judge with precision (which is the true meaning of the word criticise), and their opinion, therefore, is entitled to respect. Their criticism may be commendatory, but it is, perhaps, more generally unfavorable. Still, so long as it continues to be criticism at all, it is not defamatory. Where defamation commences, true criticism ends.

"True criticism differs from defamation in the following particulars:

1. "Criticism deals with only such things as invite public attention, or call for public comment.

2. "Criticism never attacks the individual, but only his work. Such work may be either the policy of a government, the action of a member of parliament, a public entertainment, a book published, or a picture exhibited. In every case the attack is on a man's acts, or on some thing, and not upon the man himself. A true critic never indulges in personalities.

3. "True criticism never imputes or insinuates dishonorable motives (unless justice absolutely requires it, and then only on the clearest proofs). .

4. "The critic never takes the advantage of the occasion to gratify private malice, or to attain any other object

31—93

beyond the fair discussion of matters of public interest, and the judicious guidance of the public taste."

We find the same rule laid down in Newell on Slander and Libel 2 ed., pages 564 and 567. "Criticism, fair comment made in good faith. Every person has a right to comment on matters of public interest and general concern, provided he does so fairly and with an honest purpose. Such comments are not libelous, however severe in their terms, unless they are written intemperately and maliciously. Every citizen has full freedom of speech on such subjects, but he must not abuse it. The general rule to be adhered to in criticising or commenting on matters of public interest is to confine the comments to the matter itself and not to descend to personal attacks on private character or imputations of unworthy motives. For the public benefit the law confers a privilege upon fair and honest criticism and this privilege should never be abused in order to gratify personal malice or to advance private interest. The advancement of truth, the triumph of goodness, the destruction of falsehood and ignorance should be the object of the critic, the commentor or the reviewer, and these principles alone should animate him in the performance of his duty. His sole and single purpose should be to promote the public good, to enable the people to discern right from wrong, to encourage merit, and to firmly condemn and expose the charlatan and the cheat.

*"Criticism distinguished from defamation.* Criticism differs from defamation in the following particulars:

1. "Criticism deals only with such things as invite public attention or call for public comment. It does not follow a public man into his private life or pry into his domestic concerns.

2. "It never attacks the individual but only his work. Such work may be either the policy of a government, the action of a member of a legislative body, a public entertainment, a book published or a picture exhibited. In every

case the attack is on a man's acts, or on something, and not upon the man himself. A true critic never indulges in personalities, but confines himself to the merits of the subject matter.

3. "It never imputes or insinuates dishonorable motives, unless justice absolutely requires it, and then only on the clearest proofs.

.4. "The critic never takes advantage of the occasion to gratify private malice or to attain any other object beyond the fair discussion of matters of public interest, and the judicious guidance of public tastes. He carefully examines the matter, and then honestly and fearlessly states his true opinion of it."

In *Bearce* v. *Bass* (Maine, 1896), 51 Am. St. Rep. 446, 450, the Court said: "It is sometimes said that fair and honest criticism in matters of public concern is privileged. But this is not true in a strict legal sense. The distinction between fair and reasonable comment and criticism, and privileged communications, is this: That in the latter case, the words may be defamatory, but the defamation is excused or justified by reason of the occasion; while in the former case, the words are not defamatory of the plaintiff, and hence not libellous—the stricture or criticism is not upon the person himself, but upon his work. So long, therefore, as the criticism is confined to his work, and does not attack the moral character or professional integrity of the individual, and is fair and reasonable, there is no libel, because there is no defamation of the man himself. But, when the comment or criticism of the man's work becomes an attack on his private or business character, then the element of malice comes in and stamps the language as libellous. *Fraser* v. *Berkeley,* 7 Car. & P. 621."

In *Howarth* v. *Barlow,* 113 App. Div. (N. Y.), 510, the Court said: "The plaintiff's whole official conduct in the matter was open to the fullest criticism, and the defendant and all other persons had the right to draw from it and express any

opinions or inferences that could be drawn from it, although contrary, and it may be, more reasonable ones could be drawn from it. That such opinions or inferences are far-fetched, high-strung, or severely moral, or contrary to other opinions or inferences that seem more reasonable, does not matter so long as there is a basis for them in the acts or words of the person who is subject to such criticism. The majority or prevailing opinion is not the test of whether such opinion or inference be permissible. The prevailing or majority opinion is often the wrong one, and for that reason the law gives full latitude to the expression of any and all opinions on things of general concern. It does not matter that the opinions or inferences expressed are not the most charitable or reasonable ones, or that they are the wrong ones, provided they be based on the facts, and the facts are capable of them. This is the rule of latitude of discussion and criticism of every one who holds a public office, or writes a book, or does any act by which he invites public attention and criticism. *McDonald* v. *Sun Printing and Publishing Assn.,* 45 Misc. Rep. 441.

"The people are not obliged to speak of the conduct of their officials in whispers or in bated breath in a free government, but only in a despotism. On the contrary, they have a right to speak out in open discussion and criticism thereof, the only test being that they make no false statement. And this is the great safeguard of free government and of pure government. This is fundamental among us."

While an officer's public acts may be criticised, the publication must not contain a charge against his personal or moral character. In the case of *Negley* v. *Farrow,* 60 Md. 158, the defendant, a newspaper, in the publication of an article charged the plaintiff, who was a senator, with being under corrupt influences, a traitor to his party, and accepting bribes. The Court held the publication libellous, on demurrer, and said: "No one denies the right of defendants to discuss and criticise boldly and fearlessly the official con-

duct of plaintiff. It is a right which, in every free country, belongs to the citizen, and the exercise of it, within lawful and proper limits, affords some protection at least against official abuse and corruption. But there is a broad distinction between fair and legitimate discussion in regard to the conduct of a public man, and the imputation of corrupt motives by which that conduct may be supposed to be governed. And if one goes out of his way to asperse the personal character of a public man, and to ascribe to him base and corrupt motives, he must do so at his peril; and must either prove the truth of what he says, or answer in damages to the party injured."

"A newspaper has the right to fairly and honestly comment on matters of public interest, such as the official conduct of a public officer. * * * The right of a newspaper to comment within its privilege on matters of public interest, such as the conduct of a public officer, includes the right to express opinions as to his acts and to draw inferences as to his motives, whether they be right or wrong, or reasonable or unreasonable, provided they are made in good faith and based on facts. * * * Newspaper comment on acts of public officers are not privileged, when made maliciously." *Cook* v. *Pulitzer Pub. Co.,* S. W. 145-481.

In Newell on Slander and Libel (2d ed.), page 577, we find: "In the exercise of the right of criticism in matters of public interest, it necessarily results that public officers will not always be placed before the people in their true character, but that their official acts will be misconstrued and wrong motives will be imputed, even when they are entirely free from blame and no valid basis for unfavorable comment exists. That is the common experience of all who have held public office. This incident of official position was aptly expressed by the noted English jurist, Cockburn, C. J., as follows: 'Those who fill a public position must not be too thin-skinned in reference to comments made on them.

It would often happen that observations would be made upon public men which they know from the bottom of their hearts were undeserved and unjust; yet they must bear'with them, and submit to be misunderstood for a time, because all know that the criticism of the press was the best security for the proper discharge of public duties.' "

The plaintiffs were not candidates for election to public office, but were exercising their constitutional rights as voters and taking an active part in the selection of candidates. They voluntarily took a *quasi* public position and thereby invited criticism. It is, in a measure, now the practice for candidates for public office to have headquarters, a campaign manager, parties to distribute literature, spellbinders, strikers, challengers, heelers and electioneers, all of which is a part of the political machinery, whereby a person is elected to office, and we see no reason why a voter, who voluntarily becomes a part of this machinery for the purpose of electing one to office, should not be subject to the same criticism that the candidate to office is subject to.

If the voter voluntarily goes to the polls to influence another's vote by whispering in every voter's ear or attempting to insinuate his hands in every candidate's pocket, we see no reason why he is not a fair mark for legitimate criticism.

"All political, legal and ecclesiastical matters are matters of public concern, so is the conduct of every town and city council and the like. * * * Anything that is a public concern of the inhabitants is a matter of public interest within the meaning of the rule. The public conduct of every public man is a matter of public concern. * * * Where an individual, or organization, invites public attention in any way or appeals for public patronage, it challenges public criticism. When a man comes prominently forward in any way and acquires for a time a *quasi* public position, he cannot escape the necessary consequences, the free expression of public opinion. Whoever seeks notoriety or invites pub-

lic attention is said to challenge public criticism, and he can not resort to the law Courts if that criticism be less favorable than he anticipated." Odgers on Libel and Slander, pp. 40-41, 45, 50.

The plaintiffs had the right to vote for whom they pleased and had the legal right to persuade others to vote for whom they wished. The publications do not charge them with bribery or any illegal act. There is nothing in the allegations of fact impeaching the honesty or integrity or reputation of plaintiffs, the words are not libellous *per se*. We think that the plaintiffs occupied a *quasi* public position and their conduct was the subject of fair and *bona fide* criticism by a public newspaper.

I think the exceptions should be overruled and judgment affirmed.

February 4, 1913. PER CURIAM. After careful consideration this Court is satisfied that no material question of law or fact has either been overlooked or disregarded. The differences in the allegations of the complaints are not sufficient to change the result.

It is, therefore, ordered that the petition for a rehearing be dismissed and the order heretofore granted staying the remittitur be revoked.