[File No. 6102.]

F. E. McCURDY, Respondent, v. E. A. HUGHES et al.
and
E. A. HUGHES and George D. Mann, Appellants.

(248 N. W. 512, 87 A.L.R. 683.)

Opinion filed April 10, 1933.   Rehearing denied May 20, 1933.

*O'Hare, Cox & Cox* and *Zuger & Tillotson,* for appellants.

438

*Scott Cameron,* for respondent.

BURKE, J. This is an appeal from a judgment and from an order denying defendants' motion for judgment notwithstanding the verdict or in the alternative for a new trial.

The plaintiff is an attorney at law and was on the 12th day of January, 1929 and for four years prior thereto the state's attorney of Burleigh county and on that day he alleges, in his complaint, that the defendants caused to be made a certain affidavit, which is made a part of the complaint and caused the same to be published in the Bismarck Tribune and by the Associated Press and the subscribers to its service and also caused to be written a certain comment by way of editorial and news comment and caused great headlines to be written in the Bismarck Tribune concerning the plaintiff in his capacity and profession as an attorney at law and his past record as state's attorney of Burleigh county, North Dakota. It is further alleged that the publication is false and defamatory and malicious and that the defend-

ants intended to maliciously injure and defame the plaintiff in his reputation and his business.

The defendant Hughes, by answer, denies that he published, or caused to be published, any of the said charges and alleges that he filed a complaint against the plaintiff with the clerk of the Supreme Court; that the statements made in the complaint were true and that the complaint filed was a privileged communication to the court.

The defendant Mann denies that he personally published the affidavit, or the said complaint, of E. A. Hughes and alleges that the Bismarck Tribune published the same in good faith, as legitimate news, as shown by the public records in the office of the clerk of Supreme Court and avers that no malice, ill will or intent to defame the plaintiff was intended by such publication; and only lawful comments to the said publication were made.

The case was tried to a jury and verdict rendered for the plaintiff, upon which judgment was duly entered and thereafter the defendants moved for judgment notwithstanding the verdict, or in the alternative, for a new trial, which motion was denied and the defendants appeal from the judgment and from the order denying the motion.

Defendants' assignments 1, 2, 14, 16, 17 and 35 all relate to the question of the liability of the defendant Hughes for the publication of the affidavit and articles complained of as libelous. The only wrongful acts alleged in the complaint, as a basis for recovery against the defendants, are charged in paragraph three of plaintiff's complaint, which is as follows: "That on or about the 12th day of January 1929, at Bismarck, the defendants caused to be made a certain affidavit, which is annexed hereto, marked Exhibit 'A' and made a part hereto by reference as completely as though the same were set out in full, and caused the same and references thereto to be published in The Bismarck Tribune and by the Associated Press and the subscribers to its service and also caused to be written a certain comment by way of editorial and news comment and caused great headlines to be written in the Bismarck Tribune which said headlines and news matter and editorial matter are set out on exhibit 'B' attached to and made a part of this complaint by reference as completely as though set out in the body herein and which said affidavit and words concerning the plaintiff and said editorial comment and said news item were written

of and concerning the plaintiff in his capacity and profession as an attorney at law and his past record as state's attorney of Burleigh county, North Dakota." There is no allegation in the complaint relating to any publication other than as alleged in the foregoing paragraph three. It is clear from this paragraph that plaintiff's cause of action for damages is based upon the publication of the affidavit as alleged in said paragraph three.

It is the contention of the defendants that there is nothing in the evidence connecting the defendant, E. A. Hughes, with the publication of the article in the Tribune, which article is the basis of plaintiff's cause of action. That the defendant Hughes, in a casual conversation with Mann, simply stated that he was going to file a complaint, or charges, against Mr. McCurdy in the Supreme Court; that Mr. Mann said that the Tribune or Associated Press might be interested to know when they were filed and Mr. Mann is not sure, but thinks, that Mr. Hughes did call him up and tell him that the complaint had been filed; that while Mr. Hughes denies that he called Mr. Mann and told him the complaint had been filed, that even if Mr. Mann is correct in his statement, then the information given to Mann that the charges had been filed was in accordance with Mr. Mann's express wish to get the information and that it was public matter, filed in a public office which Mr. Mann could have secured by telephoning the clerk.

Defendants rely upon the case of Schoepflin v. Coffey, 162 N. Y. 12, 56 N. E. 502. In this case the complaint charges "that on the fifteenth day of May, 1895, . . . the defendant maliciously spoke and published concerning the plaintiff the false and defamatory words following: 'An indictment has been issued against Schoepflin (meaning this plaintiff) by the grand jury of Albany county in connection with Campbell's ice bill, and a warrant is out for his arrest;' 'I know that an indictment has been found against Schoepflin (meaning this plaintiff) by the grand jury in connection with Campbell's ice bill, from the best authority in the world; I would gamble on it,' meaning and declaring thereby that he knew the grand jury of Albany county had found an indictment against the plaintiff, who was then a member of the legislature, for corrupt and criminal conduct with a bill which had been introduced and was pending in the assembly; that such statements were made in the presence of G. Edward Graham, and Lewis

J. Seabold; and that Graham was manager of the Associated Press at Albany, and Seabold was a reporter and news-gatherer for the New York World. It was then averred, 'and thereby defendant caused said false and defamatory statement to be printed and published in most of the daily newspapers of the state of New York and in the said New York World.'" The court said: "Obviously the complaint contains no sufficient allegation that the defendant caused the printing or publication of the words spoken, to constitute a cause of action against him for libel." The complaint alleged that he made the defamatory statement in the presence of certain newspaper correspondents and there is nothing to show that he had anything to do with the publication of these statements. There is no allegation that he had anything to do with the publication of the statement which he made. He simply made the defamatory statements in the presence of newspaper correspondents. The court continues: "The next question presented is whether the proof was sufficient to justify the court in submitting to the jury the question whether the defendant caused or procured the publication of the alleged libel. In discussing this question, we shall assume that a person who requests, procures or directs another to publish a libel, or connives at or assists in its publication, is liable therefor. But to justify a jury in finding a defendant liable for such publication, there must be some evidence that it was procured by him, or that he was guilty of some affirmative act which secured or induced it. The mere speaking of words in the presence of third persons that are not actionable per se would at most amount to a mere slander, even if special damages were alleged, and their repetition or the printing and publication of them by the independent act of a third party, would not render the person speaking them responsible therefor. It is too well settled to be now questioned that one who utters a slander, or prints and publishes a libel, is not responsible for its voluntary and unjustifiable repetition, without his authority or request, by others over whom he has no control and who thereby make themselves liable to the person injured, and that such repetition cannot be considered in law a necessary, natural and probable consequence of the original slander or libel. Newell, Defamation, 245; Moak's Underhill, Torts, 145; M'Gregor v. Thwaites, 3 Barn. & C. 35, 107 Eng. Reprint, 643." There was no allegation in the complaint in that case and apparently there was no

evidence that the defendant knew anything about the publication nor had anything to do about the publication of the libel. He simply made the bald statements in the presence of newspaper reporters and they did the rest. Nothing to show that he knew that they were newspaper reporters or that the statement was made for the purpose of having them published; nothing to show that he connived at or assisted in the publication of the libel.

This case is further considered in the case of Valentine v. Gonzalez, 190 App. Div. 490, 179 N. Y. Supp. 711. At page 492 the court says: "The learned Special Term in its opinion relied upon the case of Schoepflin v. Coffey, 162 N. Y. 12, 56 N. E. 502. In that case the evidence showed that the defendant orally defamed the plaintiff in the presence of two persons, who were reporters. They thereafter caused the defamatory matter to be printed in various newspapers. The court held that the defendant was not responsible for the voluntary and unjustifiable repetition, without his authority or request by others, over whom he had no control. It cannot be said in the case at bar that the matter complained of was published without defendant's authority. He was told by the reporter that the writings were going to be published in articles to be written by him, and on a second occasion even sent more documents to the reporter in response to the latter's telephone message. The defendant not only knew that he was giving information to a reporter of a newspaper, but was advised before giving it that such information was requested for publication. Weston v. Weston, 83 App. Div. 520, 82 N. Y. Supp. 351."

In the instant case the defendant Hughes knew that the defendant Mann was the editor and publisher of the Bismarck Tribune. He admitted, when he told Mr. Mann that he expected to file charges against Mr. McCurdy, that Mr. Mann mentioned that the Tribune and Associated Press would be interested as it was a matter of news; that Mr. Mann asked him to let him know when the charges were filed and Mr. Mann is not certain but thinks Mr. Hughes did let him know when the charges were filed. Upon the whole evidence relating to the conversation between Mr. Hughes and Mr. Mann and the circumstances that Mr. Erhardt got the document from Mr. Hughes' attorney, who prepared the original, and Mr. Erhardt was told that he was to go to the office of O'Hare, Cox & Cox, attorneys for Mr. Hughes, for a document

and that they would know what he wanted, all considered together, is evidence from which the jury might draw the inference that Mr. Hughes had something to do with causing the publication of the article in the Bismarck Tribune.

Assignments 32 and 33 relate to the instruction, viz.: "You are further instructed that plaintiff's Exhibit 'A' was made and filed in the Supreme Court of the State of North Dakota in a proceeding authorized by law by the defendant E. A. Hughes, and that the same as so made and filed was then, and now is, a privileged communication, and that you cannot allow the plaintiff any damages against the defendants, or either of them, by reason of the making and filing of said plaintiff's Exhibit 'A' aforesaid, in the event you find same was presented to and filed with the Supreme Court, unless you find in the making and filing and publishing such articles, if defendants did so publish the same, defendant Hughes or some one or more of the other defendants were actuated with actual malice, and that same were made and published without probable cause."

Later in the instructions this instruction is emphasized as follows: "Where one has probable cause and justification therefor, and without malice, he has a right to file a written complaint with the clerk of the Supreme Court, charging any member of the bar of this state with conduct warranting disbarment or suspension as an attorney at law, and when so filed the same shall thereupon be referred to the clerk of the State Bar Board for investigation, and report to the Supreme Court for further proceedings to be had, and when so made and filed, the law designates such as a privileged communication to the ones entitled to receive the same by the one so making and filing the same, and the one who predicates libel thereon by reason of so making and so publishing such a complaint cannot recover unless such one shows actual malice, that is, hatred or ill will on the part of such one making, filing or so publishing the same, or shows a want of just cause or excuse in the making and filing of such accusation."

This instruction is erroneous for two reasons: First, the cause of action is based, not on the filing of the charges in the Supreme Court, but on the publication of the charges in the Bismarck Tribune and under this instruction, if the jury found that the charges were filed in the Supreme Court with malice and without probable cause, the jury

might find for the plaintiff. Second, one of the questions of fact in the case is, did Hughes have anything to do with causing the publication of the charges in the Tribune? The jury might have found, under the evidence, that Hughes had nothing to do with the publication of the charges in the Tribune and yet under the instructions could have found against him for filing and publishing the charges in the proceeding in the Supreme Court. Under the instruction defining publication the filing of the charges in the Supreme Court was a publication.

According to this instruction and the instruction defining publication the making and filing of the charges against Mr. McCurdy in the Supreme Court was a privileged communication, unless the jury should find that the making and filing of such charges in the Supreme Court was done with actual malice and without probable cause.

This is not the law. The making of a complaint, against an attorney at law, to the Supreme Court is a preliminary step in a proceeding authorized by law. Under subdivision 2 of § 4354, Compiled Laws 1913, the making of the complaint was absolutely privileged. This section provides: "Privileged Communications. A privileged communication is one made: 2. In any legislative or judicial proceeding, or in any other proceeding authorized by law."

In the case of Cowley v. Pulsifer, 137 Mass. 392, 50 Am. Rep. 318, involving a libel suit, for publishing in a newspaper a complaint filed in a supreme court against an attorney, Judge Holmes distinguishes between the making of the complaint against an attorney in the Supreme Court and the publication of that complaint in a newspaper and assumes that no liability was involved on the part of the petitioner by reason of his filing the complaint in the Supreme Court, but holds that the publication in the newspaper was not privileged.

Our statute makes the distinction assumed by Judge Holmes. The making of the complaint to the Supreme Court, under our statute, is absolutely privileged, but the question of privilege, as applied to the publication of the complaint in the newspaper, depends altogether upon whether the publication was a fair and true report without malice of a public official proceeding under subdivision 4 of § 4354, which reads as follows: "(A privileged communication is one made:) 4. By a fair and true report without malice of a judicial, legislative or *other public official proceeding,* or of anything said in the course thereof."

A fair and true report of a judicial proceeding, a legislative proceeding or other public official proceeding is privileged, if made without malice. The words in the statute, namely: "other public official proceeding" implies that all proceedings, judicial, legislative and otherwise, to be privileged, must be public and the courts have been very liberal in extending the privilege. Sweet v. Post Pub. Co. 215 Mass. 450, 102 N. E. 660, 47 L.R.A.(N.S.) 240, Ann. Cas. 1914D, 533; Kimball v. Post Pub. Co. 199 Mass. 248, 85 N. E. 103, 19 L.R.A. (N.S.) 862, 127 Am. St. Rep. 492; Kimber v. Press Asso. [1893] 1 Q. B. 65, 71; Lilley v. Roney, 61 L. J. Q. B. N. S., page 727; Cowley v. Pulsifer, 137 Mass. 392, 50 Am. Rep. 318, supra; Beiser v. Scripps-McRae Pub. Co. 113 Ky. 383, 68 S. W. 457; Bunton v. Worley, 4 Bibb, 38, 7 Am. Dec. 735; McBee v. Fulton, 47 Md. 403, 28 Am. Rep. 465; Fitch v. Daily News Pub. Co. 116 Neb. 474, 217 N. W. 947, 59 A.L.R. 1056; Stone v. Hutchinson Daily News, 125 Kan. 715, 266 Pac. 78, 58 A.L.R. 718; Lundin v. Post Pub. Co. 217 Mass. 213, 104 N. E. 480, 52 L.R.A.(N.S.) 207; Campbell v. New York Evening Post, 245 N. Y. 320, 157 N. E. 153, 52 A.L.R. 1432. Numerous cases in England and in the United States hold that the rule of privilege does not apply to pleadings which, though filed, have not yet received judicial notice. Stuart v. Press Pub. Co. 83 App. Div. 467, 82 N. Y. Supp. 401; Williams v. New York Herald Co. 165 App. Div. 529, 150 N. Y. Supp. 838; Lundin v. Post Pub. Co. 217 Mass. 213, 104 N. E. 480, 52 L.R.A.(N.S.) 207, supra; Burdick, Torts, 4th ed, p. 391; Newell, Slander & Libel, 4th ed., p. 412; 27 Columbia L. Rev., p. 225, and cases cited; Nixon v. Dispatch Printing Co. 101 Minn. 309, 112 N. W. 258, 12 L.R.A.(N.S.) 188, 11 Ann. Cas. 161. See Ilsley v. Sentinel Co. 133 Wis. 20, 113 N. W. 425, 126 Am. St. Rep. 928.

If the publication of the complaint in the Tribune was a fair and true report of a public proceeding, it was privileged if made without malice. The first question to determine is, was the making of the complaint in this court a public proceeding?

Section 808, Supplement to the 1913 Compiled Laws, reads as follows: "Whenever it is brought to the attention of the supreme court of the state of North Dakota by verified complaint that any member of the bar of said state is charged with conduct warranting his disbarment or suspension, and it appears to such court that such charges

should be investigated, the said court may, in its discretion, refer the matter to the state bar board, with directions to investigate such charges, and when any such matter is so referred to the said Bar Board for investigation each of the members of said Bar Board shall have power and authority to administer oaths to witnesses and take testimony in regard to such charges and to issue subpœnas commanding witness so to appear at any place within the judicial district where such witnesses may reside."

This proceeding is, in a sense, a proceeding authorized by law and protects the party making the complaint, but it does not contemplate a public proceeding in advance of the preferment of charges in an action to disbar. It does not say that the charges shall be filed with the clerk of court, but provides that whenever it is brought to the attention of the supreme court and it is made to appear to such court that such charges should be investigated, "the court may, in its discretion, refer the matter to the state bar board, with directions to investigate such charges." It has never been the practice of this court to treat such matters as public. If the matter is referred to the bar board and from its report to this court it appears probable that the conduct of the attorney warrants disbarment or suspension, the court directs a proceeding in disbarment to be instituted by the filing of the charges and it then becomes public.

In the case of People ex rel. Karlin v. Culkin, 248 N. Y. 465, 162 N. E. 487, 60 A.L.R. 851, a petition by three leading bar associations was presented to the Appellate Division for the First Judicial Department in the State of New York in 1928 complaining about evil practices among members of the bar. One attorney, who had been subpœnaed, refused to testify and was cited for contempt. Among other things, Judge Cardozo, who wrote the opinion, said: "The argument is pressed that, in conceding to the court a power of inquisition, we put into its hands a weapon whereby the fair fame of a lawyer, however innocent of wrong, is at the mercy of the tongue of ignorance or malice. Reputation in such a calling is a plant of tender growth, and its bloom, once lost, is not easily restored. The mere summons to appear at such a hearing and make report as to one's conduct may become a slur and a reproach. Dangers are indeed here, but not without a remedy. The remedy is to make the inquisition a secret one in its

.preliminary stages. This has been done in the First judicial department, at least in many instances, by the order of the justice presiding at the hearing. It has been done in the Second judicial department, where a like investigation is in progress (Re Brooklyn Bar Asso. 223 App. Div. 149, 227 N. Y. Supp. 666), by order of the Appellate Division directing the inquiry. A preliminary inquisition, without adversary parties, neither ending in any decree nor establishing any right, is not a sitting of a court within the fair intendment of § 4 of the Judiciary Law, whereby sittings of a court are required to be public. It is a quasi administrative remedy whereby the court is given information that may move it to other acts thereafter. Cf. Re Richardson, 247 N. Y. 401, at pages 413, 418, 160 N. E. 655. The closest analogue is an inquisition by the grand jury for the discovery of crime. There secrecy of counsel is enjoined upon the jurors by an oath of ancient lineage. Sir Frederick Pollock, Essays in the Law, p. 212. It would be strange if disclosure were a duty upon an inquisition by the court. There is a practice of distant origin by which disciplinary proceedings, unless issuing in a judgment adverse to the attorney, are recorded as anonymous. See, e. g., Re an Attorney, 83 N. Y. 164; Re H, 87 N. Y. 521. The need of secrecy is the greater when the proceeding is in the stage of preliminary investigation." In this case the lawyer was held guilty of contempt. The procedure, as outlined by Judge Cardozo, has always been the practice of this court in the preliminary steps of disbarment proceedings.

This court has never construed § 808, Supplement to the Compiled Laws, 1913, as intending a public hearing on a complaint made to the supreme court relating to the conduct of an attorney. When such matter is presented to the Supreme Court it is taken up in the office of the Chief Justice, in regular council chambers, where the judges meet in conference to confer and decide on their written opinions. The meetings are not public and such matters are not discussed in the presence of others. If the court is of the opinion that the matter should be further investigated, it is referred to the bar board. If the complaint does not warrant action, no further action is taken and no public record is made. As Judge Cardozo said, "It is a quasi administrative remedy whereby the court is given information that may move it to other acts thereafter." Clearly there was no public proceeding before

the court at the time of the publication of the charges in the Tribune and the publication of the complaint in the Tribune was not privileged.

This disposes of the specifications of error relating to the question of malice and punitive damages. It is true that no witness testified to actual malice, but malice may be shown by circumstantial evidence, and since the publication of the charges was not privileged it was not necessary to prove actual malice, as that might be inferred from the publication, if the matter published was libelous, and, for the same reason, that is if the matter published was libelous, the jury might allow punitive damages. Section 7145 of the Compiled Laws, 1913; Meyerle v. Pioneer Pub. Co. 45 N. D. 568, 178 N. W. 792; Watt v. Longsdon [1930] 1 K. B. 130, 69 A.L.R. 1005—C. A. The question of malice and punitive damages was for the jury under proper instructions relating to unprivileged publications.

Since there must be a new trial, it is proper to say that the instruction defining the publication of criminal libel should not have been given. The act defining the publication of a criminal libel, as given in the instruction, is chapter 128, Laws of 1905. It is entitled: "An Act Defining Criminal Libel and Conspiracy to Libel, and Providing Punishment Therefor." Although it does not purport to, it does re-enact and amend §§ 7146, 7147, 7148, and 7149 of the Revised Code of 1895 (relating to crime). There is and always has been a clear distinction between civil libel and criminal libel. Defamation, under § 4351, is effected by (1) libel; or (2) slander. Defamation, either by libel or slander, is a violation of the personal rights of individuals for which the injured party may recover damages. Criminal libel is an offense against the public. In civil cases it is necessary to show a publication to some third person other than the person defamed. In criminal cases it is not necessary; it is sufficient to prove a publication to the prosecutor himself, provided the obvious tendency of the words · be to provoke the prosecutor and excite him to break the peace. Odgers, Libel & Slander, page 467; Newell, Slander & Libel, 4th ed., pages 938, 939; Mankins v. State, 41 Tex. Crim. Rep. 662, 57 S. W. 950; State v. Avery, 7 Conn. 266, 18 Am. Dec. 105; Hodges v. State, 5 Humph. 112; Rex v. Wegener, 2 Stark. 245, 171 Eng. Reprint, 634;

Phillips v. Jansen, 2 Esp. 624, 170 Eng. Reprint, 476; Reg. v. Brooke, 7 Cox, C. C. 251; Haase v. State, 53 N. J. Law, 34, 20 Atl. 751.

The instruction defining criminal libel should not have been given; as it does not apply to a civil action. Moreover, it is admitted that the complaint was published in the Bismarck Tribune and it is upon this publication the action is based.

Assignments 7 to 12 inclusive relate to the refusal of the court to admit in evidence defendants' Exhibit 2. On plaintiff's offer there was received in evidence correspondence between the plaintiff and the judge of the district court before whom the Patterson tax matter was pending. Some of the letters by the judge to the plaintiff were addressed to the plaintiff and to John Sullivan, attorney for Patterson, and duplicate letters were sent to the plaintiff and Mr. Sullivan. Certain letters written by the plaintiff to the judge were also sent to Mr. Sullivan. When Mr. Sullivan received a copy of plaintiff's letter, Exhibit "M," to the judge, he (Sullivan) wired the judge to hold the decision until he received a letter from him. He thereupon wrote the letter which was afterwards offered in evidence as Exhibit 2 and as a part of the correspondence in the case upon the theory that the plaintiff's offer of a part of the correspondence had been received and defendant was entitled to have the whole correspondence presented to the court. The record does not show that the plaintiff ever received a copy of Exhibit 2.

Appellant relies upon the case of Guild v. More, 32 N. D. 432, 155 N. W. 44. In that case the sale of a newspaper was involved. The plaintiff sought to make a sale of his interest in the Courier-News through the agency of a newspaper broker named Heinrichs. Defendant's counsel demanded and received from the plaintiff the entire correspondence between plaintiff and Heinrichs. The defendant selected five letters and a telegram from plaintiff to Heinrichs and offered the same in evidence. Plaintiff's counsel thereupon offered the remainder of the correspondence, the correspondence all relating to the same transaction and referring to a prospective purchaser. In one of the letters from Heinrichs to Guild, he refers to a letter from a prospective purchaser, saying among other things: "I am enclosing a letter ——" and this letter from the prospective purchaser was offered in evidence by plaintiff together with the other correspondence. It was claimed that this offer of a letter from a third party to Heinrichs

was not competent evidence and that it was error to admit it, but the court held that the letter from Heinrichs to Guild could not be fully understood without the letter from the third party which had been sent to Mr. Guild and that the plaintiff was entitled to have all the correspondence in evidence. The court said: "Hence, it is one of the fundamental rules of evidence, that where one party uses as evidence statements made during a conversation, or a number of a series of letters written, by the party sought to be charged or affected thereby, then the latter may offer the ·remainder of the conversation or correspondence relating to the transaction or question in issue. Jones, Commentaries on Ev., § 294; 17 Cyc. 408; Anderson v. First Nat. Bank, 4 N. D. 182, 59 N. W. 1029; Thayer v. Hoffman, 53 Kan. 723, 37 Pac. 125; and Stringer v. Breen, 7 Ind. App. 557, 34 N. E. 1015. . . . The Stedman letter was a part of this correspondence. It was directly referred to in other letters. Much of the correspondence would be misleading and confusing without it. It was necessary that . the jury should know the contents of this letter in order to fully understand the remainder of the correspondence, and to determine whether plaintiff did as a matter of fact in his correspondence make any statements contrary to his testimony at the trial. 'Where a writing offered refers to another writing, the latter should also be put in at the same time, provided the reference is such as to make it probable that the latter is requisite to a full understanding of the effect of the former.' " Wigmore, Ev., §§ 2104, 2120.

There is a distinction between that case and the instant case. In the case of Guild v. More, supra, the correspondence was between the plaintiff and Mr. Heinrichs and included a letter from a prospective purchaser, which was sent to Mr. Guild by Mr. Heinrichs. Guild knew all about it, acted on it, was affected by it and bound by it. He turned it over to the defendant with the other letters. He and Mr. Heinrichs made it a necessary part of their correspondence which could not be understood without it. In the instant case exhibit 2 is not a part of the correspondence between the plaintiff and the trial judge. There is nothing to show that the plaintiff knew anything about exhibit 2 until it was offered in evidence. Sullivan's telegram to the judge to hold the decesion until he heard from him is proof that Sullivan did not agree with plaintiff's letter to the judge and· plaintiff is not bound by

statements made by opposing counsel, which he has had no opportunity to resist or agree to. Before a letter written to a party to an action can be received in evidence as an admission against such party there must be preliminary proof that the one sought to be charged has received the letter. Huston v. Johnson, 29 N. D. 546, 555, 556, 151 N. W. 774; Jones, Ev. 1814, 1815; Com. v. Eastman, 1 Cush. 189, 48 Am. Dec. 596; Smith v. Shoemaker, 17 Wall. 630, 21 L. ed. 717; Consolidated Grocery Co. v. Hammond (C. C. A. 5th) 175 Fed. 641; People v. Colburn, 105 Cal. 648, 651, 38 Pac. 1105, 1106; Razor v. Razor, 149 Ill. 621, 36 N. E. 963.

Appellants claim that:

"The Court erred in the following instructions to the jury and there was such irregularity in the following proceedings of the Court and the jury that the defendants were prevented from having a fair trial:

"8:15 A. M., December 24, 1931.

"The Court: The Jury having returned into Court in the case of F. E. McCurdy v. E. A. Hughes, George D. Mann and Edward B. Cox, let their names be called.

"Whereupon the Clerk of Court polled the Jury.

"The Court: Members of the Jury, have you agreed upon a verdict; your foreman will answer for you.

"Foreman: Your Honor, we have.

"The verdict was passed to the Court.

"The Court: Your verdict is not acceptable. You will return your verdict according to the instructions given you. This verdict must be in the language of the instructions, finding in favor of the plaintiff and writing in the first space the names of the defendants against whom the verdict is returned, and in the second space the amount of the compensatory damages, and in the third blank space the amount of the exemplary or punitive damages. You will follow the instructions of the Court. Return to your Jury Room for further deliberation.

"Pursuant to the above instructions, the Jury retired to the Jury room; having later returned into Court and the following proceedings were had and taken, to wit:

"The Court: The jury having reported into Court in the case of McCurdy v. Hughes, et al., let their names be called.

"The Clerk: All present.

"The Court: Members of the Jury, You having a few minutes ago reported into Court with your verdict apportioning damages among different defendants, and the Court returned you to the Jury Room and asked you to return a verdict according to instructions given you have you now agreed upon a verdict? Your foreman will answer for you.

"Foreman: Your Honor, we have.

"The Court: Pass your verdict to the Court. Let the record show the verdict returned formerly was returned back to the Jury and the foreman and Jury now report that it was destroyed."

The verdict as first returned should have been made a part of the record. In its absence the record is very confusing. The jury returned some verdict. What it was we do not know, but it was not satisfactory to the court, and while the jury was instructed to return to the jury room for further deliberation, they were told that the verdict must be in the language of the instructions finding in favor of the plaintiff and writing in the first space the names of the defendants against whom the verdict is returned and in the second space the amount of compensating damages and in the third blank space the amount of exemplary or punitive damages. Here are specific instructions to find for the plaintiff, allowing compensatory and punitive damages. On the face of the record it is, of course, error, but as a matter of course will not arise in another trial.

In an additional brief the defendant Mann contends that he is personally not responsible for the publication of the complaint in the Tribune; that the Tribune is a corporation responsible for its own acts and, therefore, the defendant Mann is not a proper party. The evidence shows that Mr. Mann was the manager and editor of the Tribune; that he told Mr. Hughes that the Tribune and Associated Press would be interested in the complaint which Mr. Hughes contemplated filing in the Supreme Court against the plaintiff; that he asked Mr. Hughes to let him know when it was filed, and he directed an employee in the office to go to the office where the complaint was drawn and procure a copy. Under this evidence it was a question for the jury to say whether Mr. Mann was in any way responsible for the publication. Every person who is in any way responsible for the publication of a libel is a proper party in a libel suit.

There are other irregularities specified as error which are not considered as they will not arise in a new trial.

The judgment and the order denying a new trial are reversed and a new trial is ordered.

NUESSLE, Ch. J., and BURR, CHRISTIANSON and BIRDZELL, JJ., concur.

BURKE, J. (On petition for rehearing.) In a very able petition for a rehearing appellant strenuously insists that this court lay down a rule of law for the guidance of the trial court in this and similar cases upon the problem raised by assignment of error number 28, as follows: "The Court erred in the form of the verdict submitted to the jury in behalf of the plaintiff in that such verdict allowed or required the jury to find, if they found for the plaintiff at all, to find a like amount both as to compensatory and punitive damages against the defendants jointly, whereas each defendant was entitled to separate determination and verdict as to the amount of punitive damages, if any given; and, properly, a verdict against one or more defendants for punitive damages might not have warranted such a finding as to the other or others; and such form of verdict as submitted was especially prejudicial to the defendant Mann."

Section 7145, Compiled Laws 1913, relating to exemplary damage reads as follows: "In any action for the breach of an obligation not arising from contract, when the defendant has been guilty of oppression, fraud or malice, actual or presumed, the jury in addition to the actual damages may give damages for the sake of example and by way of punishing the defendant." Before the jury can allow exemplary damages, it must first find that the acts of the defendants complained of by the plaintiff resulted in actual damages to the plaintiff and after the allowance of a sum of money sufficient to compensate the plaintiff for the injury, then the jury, in its discretion, may consider the question of exemplary damages, and if it finds that the defendants were guilty of fraud or malice, actual or presumed, it may give such damages for the sake of example and by way of punishing the defendants. Lindblom v. Sonstelie, 10 N. D. 140, 86 N. W. 357; Stockwell v. Brinton, 26 N. D. 1, 142 N. W. 242; Powell v. Meiers, 54 N. D. 336, 209 N.

W. 547. In other words, the jury may not allow exemplary damages unless there has been (1) actual damages alleged and proven; (2) that there has been fraud or malice, actual or presumed. That is, there must be evidence of actual malice, or, the facts and circumstances in the case must be such that malice is presumed. Whether there was actual malice or whether the facts and circumstances are such that malice is presumed are questions for the jury, and even in case there is fraud or malice, the allowance of exemplary damages is not mandatory, but may or may not be allowed, in the discretion of the jury. "In most jurisdictions, an instruction to the jury as to the award of exemplary damages should be permissive and not mandatory." 17 C. J. 972; Huber v. Teuber, 3 MacArth. 484, 36 Am. Rep. 110; Georgia R. & Electric Co. v. Baker, 1 Ga. App. 832, 58 S. E. 88; Browning v. Jones, 52 Ill. App. 597; Wimer v. Allbaugh, 78 Iowa, 79, 42 N. W. 587, 16 Am. St. Rep. 422; Louisville & N. R. Co. v. Logan, 178 Ky. 29, 198 S. W. 537; Chesapeake & O. R. Co. v. Conley, 136 Ky. 601, 124 S. W. 861; Illinois C. R. Co. v. Houchins, 121 Ky. 526, 89 S. W. 530, 1 L.R.A.(N.S.) 375, 123 Am. St. Rep. 205; Sneve v. Lunder, 100 Minn. 5, 110 N. W. 99; Topolewski v. Plankinton Packing Co. 143 Wis. 52, 126 N. W. 554; Haberman v. Gasser, 104 Wis. 98, 80 N. W. 105; Pickett v. Crook, 20 Wis. 358; 16 Cal. Jr. 136, § 102.

The defendants are sued as joint tort feasers in the publication of an alleged libelous article. It seems to be well settled that though compensatory damages may not be apportioned against joint tort feasors, exemplary damages, which under the statute are awarded in addition to actual damages, for example, by way of punishment, may be allowed in different amounts, depending upon the degree of culpability among the several wrongdoers. Thomson v. Catalina, 205 Cal. 402, 271 Pac. 198, 62 A.L.R. 235 and notes; Ætna L. Ins. Co. v. Brewer, 56 App. D. C. 283, 12 F. (2d) 818, 46 A.L.R. 1499; Nelson v. Halvorson, 117 Minn. 255, 135 N. W. 818, Ann. Cas. 1913D, 104.

Respondent, in his brief, states that the only questions of fact are (1) did the defendant, E. A. Hughes, cause the libelous matter to be published? (2) did the defendant, Mann, cause them to be published? (3) was the publication malicious and actuated by actual malice?

Under the plaintiff's contention the first question for the jury to

determine is, did the defendant, E. A. Hughes, cause the publication of the alleged libelous matter? If he did not cause such publication or assist or abet in the publication of such matter, then no verdict can be rendered against Mr. Hughes for damages of any kind. If the jury should find that he did cause the publication of the alleged matter, the next question for the jury to determine is, did the defendant, Mann, cause the publication of such matter in the Bismarck Tribune, and if the jury should find that he did cause or assist in causing the publication of such matter, the next question for the jury to determine is, was the plaintiff injured by the publication of such matter, and if injured, what sum of money will compensate him for the actual damages sustained by reason of the publication.

If the jury determines that their verdict should be in favor of the plaintiff and against both of the defendants for compensatory damages, the jury may consider whether there was fraud or malice, actual or presumed, on the part of the defendants or either of them in the publication of such matter, and the form of verdicts submitted to the jury should be such as to permit it to render a verdict for the plaintiff as against the defendants or either of them for compensatory damages, and if they find that there was fraud or malice in the publication of the libelous article they may or may not allow exemplary damages, and if, in their discretion, they decide to allow examplary damages, they may allow such damages in different amounts, depending upon the degree of culpability between the defendants, or they may allow against one and not against the other, as it is a matter wholly within their discretion.

Rehearing denied.

NUESSLE, Ch. J., and BIRDZELL, CHRISTIANSON and BURR, JJ., concur.