**STATE of North Dakota, Respondent,**

v.

**Johnnie HAIDER, Defendant and Appellant.**

**Crim. 351.**

Supreme Court of North Dakota.

April 14, 1967.

Wheeler & Daner, Bismarck, for appellant.

Helgi Johanneson, Atty. Gen., Bismarck, Albert A. Wolf, State's Atty., Bismarck and, on oral argument, Larry A. Kraft, Asst. State's Atty., for Dale H. Jensen, State's Atty., for Burleigh County, Bismarck, for respondent.

ERICKSTAD, Judge.

By criminal complaint dated May 17, 1966, the defendant, Johnnie Haider, was charged with having committed on or about April 15, 1966, at Bismarck in Burleigh County the crime of libel. The complaint specifically alleged:

That the said defendant did then and there wilfully and unlawfully and maliciously defame one Leo Braun by making public and parting with the immediate custody to be read by others, a writing, to wit: a cancelled check which had been altered after deposit by the said Leo

Braun, which alteration tended to show a serious violation of Musicians' Union rules, causing ridicule and expense to the said Leo Braun, and depriving him of the benefits of public confidence and social intercourse.

To this charge the defendant entered a plea of not guilty. The defendant having waived a jury, the county court with increased jurisdiction found Mr. Haider guilty. Judgment upon conviction was imposed upon him on August 15, 1966. It is from that judgment that he appeals and demands a trial de novo in this court.

■ Trial de novo is not available to a defendant on an appeal from a judgment in a criminal action. State v. Timm, 146 N.W.2d 552 (N.D.1966).

[2] * * * An appeal from a judgment only, brings to this court for review errors of law committed by the trial court and appearing in the record of the action which have been preserved and presented in the manner prescribed by statute.

State v. McClelland, 72 N.D. 665, 10 N. W.2d 798, 801.

Our view of this appeal is that Mr. Haider asserts that the trial court erred in receiving in evidence facts surrounding the publication of a certain canceled check which made libelous a publication that otherwise would not have been libelous. In other words, it is Mr. Haider's contention that a publication of a writing must be libelous per se to support a charge of criminal libel.

As the insufficiency of the evidence to support the verdict (in this case the findings of the trial court) is not in issue, we may assume, for the purpose of deciding the legal issue before us, that the evidence establishes that the complaining witness, Leo Braun, a member of Local 229 of the American Federation of Musicians (hereafter referred to as the union) had been given a check for $20 by Mr. Haider, a person not a member of the union, for one dance job, but

that after it had cleared the bank and had been returned to Mr. Haider, Mr. Haider had written on its face the words "two dance jobs" or "two dance dates"; that this check, with the aforesaid inscription, was shown to some of the officers and members of the union following a meeting of the council of clubs within the city of Bismarck; that to these officers and members this inscription indicated that Mr. Braun had committed four violations of the union rules in that he had been employed twice for less than the minimum union wage scale and had been employed twice by a non-member of the union, whereas in truth the only offense he had committed was that of having been employed by a non-member of the union, inasmuch as he had been employed only once and the $20 payment exceeded the minimum wage scale for one job; that Mr. Haider had written this misleading information on the check and had presented it to an officer of the Moose Lodge so that the officer could prove that members of the union were violating their rules, with the intention that this would result in the council of clubs establishing a rule that the clubs would employ non-members of the union as well as union members at their functions; and that after this check so inscribed was seen by officers and members of the union, Mr. Braun was tried by the officers of the union, was found to have been guilty of four violations of union rules, and was fined $75, resulting in loss of favor with the union and loss of future employment.

The practical question presented then is whether the trial court erred in considering any evidence which went to explain the significance of the words "two dance jobs" or "two dance dates."

Our statute on criminal libel reads as follows:

12–28–01. "Criminal libel" defined.—A libel is a malicious defamation of a person made public by any printing, writing, sign, picture, representation, or effigy tending to expose such person to public hatred, contempt, or ridicule, or to deprive him of

the benefits of public confidence and social intercourse, or any malicious defamation made public as aforesaid designed to blacken and vilify the memory of one who is dead and tending to scandalize or provoke his surviving relatives and friends.

North Dakota Century Code.

■ There is obviously nothing in the statute on criminal libel which prohibits the receipt in evidence of testimony explaining the circumstances surrounding the publication of the writing.

In his brief on appeal Mr. Haider asserts that there appears to be very little distinction between a civil libel and a criminal libel, but that it must be borne in mind that not every libel for which a civil action lies will support a criminal prosecution.

The following is part of his argument:

The test seems to be that, in all cases where a party in order to maintain a civil action must show special damages to recover, no indictment can be sustained, because, as it is said in such cases, a suit for damages offers an adequate remedy.

In support of this contention he refers us to Wharton's Criminal Law, as follows:

* * * Whatever, if made the subject of civil action, would be considered libelous without laying special damage, is indictable in a criminal court, and by this test, therefore, the law of libel, as expressed on actions for damages, is brought to bear on criminal prosecutions. *There are cases, however, in which an action would not lie without laying special damage, in which, nevertheless, an indictment is good.* Thus, for instance, if a man write or print, and publish of another, that he is a scoundrel, or villain, it is a libel, and punishable as such; although in such cases a civil suit might not lie without special damage. [Emphasis added.]

2 Wharton, Criminal Law § 1934 (12th ed. 1932).

In support of that part of *Wharton* which we have italicized, the following cases are cited: Merchants' Insurance Company of Newark, N. J. v. Buckner, 39 C.C.A. 19, 98 F. 222; State v. Norton, 89 Me. 290, 36 A. 394; State v. Smily, 37 Ohio St. 30, 41 Am. Rep. 487.

■ It is apparently Mr. Haider's contention that the rule he would have us follow is supported by and based on the common law of England. It should be noted that in this state there is no common law in any case in which the law is declared by the Code. See § 1-01-06, N.D.C.C. We find no present day advocate of Mr. Haider's rule and see no reason why we should follow it; we therefore reject it.

Accepting the first part of his premise, that there is little distinction between civil and criminal libel (notwithstanding the distinction noted in McCurdy v. Hughes, 63 N. D. 435, 248 N.W. 512, 518, 87 A.L.R. 683, which is not pertinent to this case), we note what one of the students of the common law of England had to say regarding the meaning of words:

Words may be:—

(1) obviously defamatory;

(2) ambiguous: that is, words which, though *prima facie* defamatory, are still on the face of them susceptible of an innocent meaning;

(3) neutral; i. e., words which are meaningless till some explanation is given; such are slang expressions, words in a foreign language, words used in some special local, technical, or customary sense;

(4) *prima facie* innocent, but capable of a defamatory meaning;

(5) obviously innocent; words which cannot properly be construed so as to convey any imputation on the plaintiff.

To these different classes of words special rules of pleading, evidence, and construction apply.

Odgers, Libel and Slander 119 (5th ed. 1912).

*Odgers* states that with words obviously defamatory no innuendo is necessary and no parol evidence is admissible at the trial to explain the meaning of the words, but that when the words, if taken literally in the primary and obvious meaning, are harmless, it is still open to the plaintiff to show from the surrounding circumstances that on the occasion in question they bore a secondary and defamatory meaning.

Two of his illustrations of (4) follow:

"He is a healer of felons;" innuendo, a concealer of felons. *Held* actionable.

Pridham v. Tucker, Yelv. 153; Hob. 126; Cart. 214.

\* \* \* \* \* \*

The plaintiff, Mary Griffiths, was a butcher, and had a son, Matthew. Words spoken by defendant:—"Matthew uses two balls to his mother's steelyard;" innuendo, "meaning that plaintiff by Matthew, her agent and servant, used improper and fraudulent weights in her said trade, and defrauded and cheated in her said trade." After verdict for the plaintiff, held that the words, as stated and explained, were actionable.

Griffiths v. Lewis, 7 Q.B. 61; 8 Q.B. 841; 14 L.J.Q.B. 197; 15 L.J.Q.B. 249; 9 Jur. 370; 10 Jur. 711.

Odgers, Libel and Slander, supra, 130.

Our civil statute reads as follows:

14–02–03. "Civil libel" defined.—Libel is a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation.

North Dakota Century Code.

In construing our statute on civil libel, this court has said:

\* \* \* "If there is any doubt as to the meaning of a publication claimed to be libelous, so that extrinsic evidence is needed to determine its character as to its being actionable, it is a question for the jury, under proper instructions from the court, to find its true character and significance." Newell, Slander and Libel (2d Ed.) p. 290, § 3. And where the words of an alleged libelous publication "are reasonably susceptible of two constructions, the one innocent and the other libelous, then it is a question for the jury which construction is the proper one." In such a case if the defendant demurs to the declaration his demurrer will be overruled. Or, in other words, the rule may be stated thus: It is for the court to decide whether a publication is capable of the meaning ascribed to it by an innuendo, and for the jury to determine whether such meaning is truly ascribed. Newell, Slander and Libel (2d Ed.) p. 291, § 5. See, also, Black v. State Company, 93 S.C. 467, 77 S.E. 51, Ann.Cas.1914C, 989.

McCue v. Equity Co-op. Publishing Co. of Fargo, 39 N.D. 190, 167 N.W. 225, 229.

We believe it is reasonably inferable from that quotation that this court recognized that under certain circumstances extrinsic evidence could be received to aid the jury in determining whether a publication was libelous.

■ We accordingly hold that this was such an occasion and that it was therefore not error for the trial court to permit testimony going to the proof of the libelous nature of the words "two dance jobs" or "two dance dates" written on the canceled check.

■ Lest it be argued that it is only the meaning that the general public would ascribe to the words that could be considered in ascertaining their libelous nature,

we think especially significant what has been said on this subject by the District Court of Appeal of California. In Pridonoff v. Balokovich, 215 P.2d 929 (Cal.App. 1950), the defendant had written an article which was published in the newspaper *Narodni Glasnik,* read by persons of Yugoslav origin or ancestry, saying that the plaintiff, while a member of the staff of the American Embassy in Belgrade, Yugoslavia, was "caught carrying on flagrant espionage activities." It was contended by the defendant that this article had an innocent connotation and was therefore not actionable.

The court said:

\* \* \* The publisher is liable for what he has insinuated as well as for his explicit statements. His language will be regarded not only with reference to the actual words employed, but according to the sense and meaning under all the circumstances of the publication. And such significance will be attached to the language as it may fairly be adjudged to have conveyed. *In evaluating the publication the court will place itself in the situation of the reader to whom it is addressed and then determine the sense or meaning of the document according to its natural and popular construction.* \* \* \* [Emphasis supplied.]

Pridonoff v. Balokovich, supra, 932.

In a Washington libel action arising from a letter sent by the agent of the defendant union to officials of other unions, which charged the plaintiffs with having deserted the defendant union during a maritime strike and which characterized the plaintiffs as renegades, the court said:

\* \* \* *In the case at bar the letters in themselves would not be libelous if sent to the average individual. But, when we realize that they were sent to other unions which influenced or controlled the hiring of employees for work of appellants' usual occupation, and that the names of all of the 97 appellants were* *attached to each letter, then the apparently harmless language takes on a more sinister meaning.* An official of a union influencing or controlling the hiring of employees would naturally become incensed when he received a letter containing a list of names of workers who, the letter charged, had deserted respondent union during the 1948 maritime strike and attempted to form a rival organization for the purpose of breaking the strike and destroying the union. Although it is not directly suggested that these men be denied employment, the implication is clear. The necessary tendency of the letters was to expose appellants to hatred, contempt, ridicule or obloquy, to deprive them of the benefit of social intercourse, and to injure them in their occupation. The language of the letters, under the circumstances surrounding their publication, was libelous *per se.* [Emphasis added.]

Arnold v. National Union of Marine Cooks & Stewards Ass'n, 36 Wash.2d 557, 219 P.2d 121, 123–124.

When the canceled check was given to the officer of the Moose Lodge to display at a meeting of the council of clubs (to which meeting union officers and members had been invited), the false writing placed on it took on a sinister meaning, a meaning which ultimately deprived Mr. Braun of public confidence and social intercourse.

Mr. Haider's next contention is that inasmuch as Mr. Braun could lawfully violate union rules, the writing was not libelous. His view is that to accuse one of doing what he may lawfully do is not defamatory and therefore not libelous. In support of this contention he cites Garland v. State, 211 Ga. 44, 84 S.E.2d 9; and State v. Darwin, 63 Wash. 303, 115 P. 309.

■ We believe, however, that the better rule is that to constitute libel it is not necessary that a publication shall impute to a person the commission of a crime. White v. Birmingham Post Co., 233 Ala.

547, 172 So. 649, 651; Pridonoff v. Balo-kovich, 215 P.2d 929 (Cal.App.1950); Morley v. Post Printing & Publishing Co., 84 Colo. 41, 268 P. 540, 542; Children v. Shinn, 168 Iowa 531, 150 N.W. 864, 868.

Mr. Haider's last argument appears to be that he had an innocent motive, and that therefore malice cannot be presumed. In support of this contention he argues that it is reasonable to assume that he delivered the publication which is the subject of this action to the officer of the Moose Lodge in order to protect what he considers to be a legitimate interest. His alleged interest was in preventing the council of clubs from adopting a rule which would thereafter prevent him, a non-member of the union, from receiving employment.

In support of this argument Mr. Haider cites us to no statutory or case law.

The only statute that we find that in any way relates to the issue is § 12–28–11, which reads as follows:

12–28–11. Other privileged communications.—A communication made to a person entitled to or interested in the communication by one who also was entitled to or interested or who stood in such relation to the former as to afford a reasonable ground for supposing his motive innocent, is not presumed to be malicious, and is a privileged communication.

North Dakota Century Code.

We do not believe that the evidence submitted in this case is sufficient to bring Mr. Haider within the privilege contained in § 12–28–11. It should be noted that no witnesses were called on behalf of the defendant nor was any evidence submitted on his behalf.

The statute which we believe controls here follows:

12–28–02. When publication is presumed to be malicious.—A publication having the tendency or effect mentioned in section 12–28–01 is deemed malicious if no justification or excuse therefor is shown.

North Dakota Century Code.

The judgment of the trial court is therefore affirmed.

TEIGEN, C. J., and STRUTZ, PAULSON and KNUDSON, JJ., concur.